Larry Gene HEATH, Petitioner–Appellant,

v.

Charlie JONES, Warden, Respondent–Appellee.

No. 90–7671.

United States Court of Appeals, Eleventh Circuit.

Aug. 26, 1991.

Rehearing and Rehearing En Banc Denied Oct. 25, 1991.

Stephen B. Bright, Charlotta Nordby, Atlanta, Ga., for petitioner-appellant.

William D. Little, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

Before JOHNSON, HATCHETT and EDMONDSON, Circuit Judges.

JOHNSON, Circuit Judge:

The petitioner, Larry Gene Heath, under a sentence of death, appeals the district court's denial of his habeas corpus petition.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

In August of 1981, Larry Gene Heath spoke with his brother, Jerry Heath, about possibly hiring some men to kill his wife. Evidently, Larry Heath was suspicious that his wife, who was then nine months pregnant, was carrying the child of her former fiance with whom she allegedly was having an ongoing affair. At the same time, Larry Heath wanted to marry Denise Lambert. Despite the fact that Larry Heath was already married, he gave Ms. Lambert an engagement ring and ordered invitations printed for their impending wedding.

Heath allegedly decided to murder his wife, rather than seek a divorce, because he wanted custody over his child and because his wife had a large life insurance policy.

Larry Heath wanted his wife's death to appear to be an accident. Jerry Heath allegedly put Larry in touch with Charles Owens and Gregory Lumpkin who agreed to carry out the murder-for-hire. Larry Heath gave the two men a $500 down payment, keys to his house, and instructions that they were to drive his car with his wife in it into a creek, making the death seem to be an automobile accident. He then gave his fiancee, Denise Lambert, $1500 to give to the two men after the murder was completed. Owens and Lumpkin allegedly kidnapped Mrs. Heath from her Russell County, Alabama home on the morning of August 31, 1981. Instead of staging an accident, the two men drove her 50 miles to Troup County, Georgia where they shot her in the head with a pistol. They then dumped her body in the back seat of the car, placed a brick on the gas pedal, and sent the car speeding off into the woods. Several hours later, a lineman for a local utility company spotted the car and Mrs. Heath's body.

The Georgia and the Alabama authorities cooperated closely in the investigation. Four days later, the Georgia police arrested Heath and his girlfriend Lambert. That night, Heath confessed to the crime and implicated his brother and Owens and Lumpkin. Within the next few weeks, Jerry Heath, Charles Owens and Gregory Lumpkin were arrested.[1]

The case immediately dominated the local news. The news emphasized that Mrs. Heath was nine months pregnant when she was murdered, that her husband was motivated by the insurance money, and that he had an illicit affair with Ms. Lambert. Moreover, the media portrayed Ms. Lambert as a wealthy, carefree socialite who, while out on bail, went on an alpine skiing vacation. Heath added to the media drama by engaging in a custody battle in family court with his in-laws over his child.

### B. Procedural History

#### 1. The Indictments and Trial

Following the return of the indictment in Georgia, the Georgia prosecutor announced that he would be seeking the death penalty in the trials of Larry Heath, Owens and Lumpkin. In exchange for a life sentence, Heath pled guilty in February of 1982.[2] Two months after Heath pled guilty in Georgia, the state of Alabama indicted Heath on a charge of capital murder and sought his extradition, which was quickly granted. A trial was held in Russell County, Alabama in February of 1983. The jury returned a conviction followed by a recommendation of death.[3]

#### 2. Direct and Collateral Appeals

Heath directly appealed his conviction through the Alabama state courts to the Supreme Court. *Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). The only issue raised by Heath's appellate counsel was his double jeopardy claim. This claim was rejected by the Supreme Court on the basis of the dual sovereignty doctrine. Justices Marshall and Brennan dissented.

On February 20, 1986, Heath filed a petition for a writ of error coram nobis in Alabama state court. Following an evidentiary hearing, the state court denied the

---

**1.** The police also arrested Sanders Williams who initially agreed to kill Mrs. Heath and who accepted a down payment but later backed out of the conspiracy.

**2.** In Georgia, Sanders Williams and Denise Lambert pled guilty to the conspiracy count and each was sentenced to ten years in prison. Heath's brother initially pled guilty but then withdrew his plea, went to trial, and was acquitted. Owens and Lumpkin were convicted of murder. The prosecutor withdrew his request for the death penalty. The court, therefore, sentenced them to life imprisonment.

**3.** Alabama also indicted Owens, Lumpkin, Jerry Heath and Denise Lambert. Jerry Heath and Lambert both pled guilty and accepted 10 year sentences for conspiracy. Lumpkin was convicted and given a life sentence. Owens was sentenced to death, but the conviction was reversed on appeal. *Owens v. State*, 531 So.2d 22 (Ala.Cr.App.1987). In lieu of a retrial, Owens pled guilty and accepted a life sentence.

petition. This denial was affirmed on appeal. *Heath v. State*, 536 So.2d 142 (Ala. Cr.App.), *cert. denied*, 536 So.2d 142 (Ala. 1988).

On March 24, 1989, Heath filed this, his first, petition for a writ of habeas corpus in the Middle District of Alabama. The district court denied the petition, without a hearing, in August of 1989. A timely notice of appeal was filed. Meanwhile, Heath filed in district court a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure seeking relief from the judgment. This Court, in response to the Rule 60 motion, ordered the appeal to be held in abeyance and then later dismissed the appeal without prejudice.

Subsequently, the district court granted the Rule 60 motion, allowing Heath to file an amended petition. Heath moved for an evidentiary hearing on his amended petition. The district court denied this request and then, on July 24, 1990 denied the petition. Heath filed a timely notice of appeal, bringing this case before this Court.

## II. ANALYSIS

A. *Ineffective Assistance of Counsel on Direct Appeal* [4]

A defendant has a right to counsel to aid in the direct appeal of his or her criminal conviction. *See Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). This right to counsel is violated when appellate counsel is ineffective. *Id.; Alvord v. Wainwright*, 725 F.2d 1282 (11th Cir. 1984). This Circuit has applied the Supreme Court's test for ineffective assistance at trial, *see Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to guide its analysis of ineffective assistance of appellate counsel claims. *See Orazio v. Dugger*, 876 F.2d 1508 (11th Cir.1989). Therefore, Heath must show that his appellate counsel's performance was deficient and that this performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. While Heath can demonstrate that his appellate counsel's performance was deficient, Heath is unable to show that this deficient performance prejudiced his defense.

### 1. The Performance Prong

■ *Strickland* held that in evaluating whether the appellate counsel's performance was deficient, counsel's performance must be evaluated for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065. Courts should presume effectiveness and should avoid second-guessing with the benefit of hindsight. *Id.* at 689, 104 S.Ct. at 2065. Specifically, *Strickland* encouraged reviewing courts to allow attorneys broad discretion to represent their clients by pursuing their own strategy. However, the Court realized that merely invoking the word "strategy" to explain errors was insufficient since "particular decision[s] must be directly assessed for reasonableness [in light of] all the circumstances." *Id.* at 691, 104 S.Ct. at 2066.

The Supreme Court, on at least two occasions, has had an opportunity to explain the parameters of what constitutes a reasonable strategy for appellate advocates. In *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the Court held that the Sixth Amendment does not require appellate advocates to raise every non-friv-

---

**4.** Heath claims that his appellate counsel was ineffective for failing to raise two claims on appeal: a pre-trial publicity claim and a Fifth Amendment claim. Heath also brings these two claims as independent constitutional violations. Alabama state courts have not deemed the ineffective assistance of appellate counsel claim procedurally barred and the state does not argue that it is procedurally barred. Therefore, we will reach the merits of the ineffective assistance of appellate counsel claim. In reaching the ineffective assistance of appellate counsel claim we must discuss the two underlying claims regardless of whether they are barred from our review as independent constitutional violations because we need to determine whether or not Heath's appellate counsel was ineffective for failing to raise these claims on appeal. The state, nevertheless, argues that the two underlying claims are procedurally barred as independent constitutional violations. Heath disagrees. Therefore, before discussing each of the underlying claims we will determine whether there is a procedural bar which prevents us from reaching the merits of the claim as an independent violation.

olous issue. The Court suggested that effective advocates "winnow out" weaker arguments even though the weaker arguments may be meritorious. *Id.* at 751–52, 103 S.Ct. at 3313. The Court in *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), held that an appellate advocate who reviewed the entire record, thought about various claims, and then chose to pursue thirteen claims on appeal had furnished effective appellate assistance. The Court recognized that even though a non-appealed issue might have been successful, the appellate advocacy had to be judged in its entirety.

In the case at bar, appellate counsel's performance was deficient. Heath's attorney selected only one issue to appeal, the double jeopardy claim.[5] The argument section of his brief to the Court of Criminal Appeals was only six pages long. The argument section of his subsequent brief to the Alabama Supreme Court was only one page long. While we are loath to encourage attorneys to file numerous claims merely for the sake of filing claims, we also realize that in a capital appeal the attorney must raise many issues in a timely fashion or else the defendant may be procedurally barred from ever raising those issues. We also note that the quality of the one claim that was briefed was unreasonably deficient. Heath has provided affidavits from four criminal appellate attorneys with expertise in capital appeals who testified that his appellate counsel's decision to rely on only one claim was below "prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. All four attorneys stated that, had they supervised this appeal, they would have forbidden the filing of these briefs. One attorney stated that in Kentucky since 1976 the average capital appeal has raised 34 issues and the brief has averaged 194 pages.

This is not a case where the attorney made a strategic decision to winnow out his less persuasive claims. Heath's attorney Roney, in his testimony during the state collateral review, did not advance any reasonable strategic reasons for raising only the double jeopardy claim. While he focused on the double jeopardy claim to the exclusion of other issues during the appeal, he admitted that even before the trial, he thought the double jeopardy issue was a losing issue. Furthermore, he explained that he did not bring the change of venue/pretrial publicity claim on appeal because he thought that Heath was guilty and that Heath would be found guilty wherever he was tried. Evidently, Roney was not aware of the fact that his client had a constitutional right to a fair trial regardless of his client's guilt. We are not willing to characterize this mistaken understanding of the law as a reasonable strategy.

The state argues that Heath's appellate counsel's performance was reasonable because he was able to convince the Supreme Court to grant certiorari. While the grant of certiorari is impressive and indicates that the issue that Heath's attorney selected is "an important question of federal law," Rules of the Supreme Court, Rule 10.1(c), this alone is not dispositive. First, we note that Heath's original appellate counsel, Roney, did not draw up the petition for certiorari. Heath obtained Professor Allen, a professor from Northwestern University School of Law, to pursue the certiorari petition after his appeal in the Supreme Court of Alabama had failed. Second, the grant of certiorari does not necessarily indicate that the position advocated by Heath has any merit, only that it is an important question. We are reluctant to conclude that the selection of an important question of federal law, to the exclusion of other issues, which was ultimately

---

5. It should be noted that Heath's counsel could have brought an interlocutory appeal of his double jeopardy claim. *See Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (holding that the Double Jeopardy Clause allows interlocutory appeals because part of the right not to be placed in jeopardy twice is lost if the claim is not brought prior to trial). Consequently, if his counsel felt that the claim was so strong, he could have brought a claim prior to trial and he could have thereby focused his appeal from the final judgment on other grounds.

unsuccessful, is sufficient to redeem an otherwise poor appellate performance.

### 2. The Prejudice Prong

While we conclude that Heath's appellate counsel's performance was deficient, we cannot conclude that Heath is able to show any prejudice from this poor performance. A petitioner has satisfied the prejudice prong of *Strickland* when he or she can show that the appellate counsel's performance was sufficiently deficient to deprive the defendant of "a trial [or an appeal] whose result [was] reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In the context of an ineffective assistance on appeal claim, this Court in *Cross v. United States*, 893 F.2d 1287 (11th Cir.1990), held that in order to determine prejudice the court must first perform "a review of the merits of the [omitted or poorly presented] claim." *Id.* at 1290. If the Court finds that the neglected claim would have a reasonable probability of success on appeal, then according to *Cross* it is necessary to find "appellate counsel's performance prejudicial because it affected the outcome of the appeal." *Id.*

With the legal standards for prejudice in mind, Heath claims that his appellate counsel would have been successful if he had raised two claims on appeal.

#### a. *Denial of Fair and Impartial Jury*

■ Heath first alleges that he was denied a fair and impartial jury due to extensive and highly prejudicial pretrial publicity.[6] In support of this allegation,

Heath notes that local TV and newspapers extensively covered the murder, the investigations, and the assorted trials. Heath's allegations raise three related claims: first, whether the trial court erred in not striking individual jurors for cause; second, whether the publicity created inherent prejudice; and third, whether the publicity caused actual prejudice.

Heath argues that the trial court erred in failing to strike some of the jurors for cause. A prospective juror must be removed for cause if his or her views "'would prevent or substantially impair the performance of his [or her] duties as a juror.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). This Circuit has held that the question of whether a juror was in fact biased is a question of fact. *See Bundy v. Dugger*, 850 F.2d 1402, 1426 (11th Cir. 1988). A habeas petition will be granted for a state trial court's failure to strike a juror for cause only when there is not fair support in the record for the trial court's determination that the juror was unbiased. *Id.* Heath discusses the fact that, of the eighty-one veniremembers, he challenged sixty-seven of them for cause (including all twelve of the eventual jurors), and the trial court granted only eight of his challenges for cause.[7] However, even if a veniremember should have been struck for cause, the Supreme Court in *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), held that there is no constitutional violation where the biased veniremember

---

**6.** In addition to our considering this claim in the context of an ineffective assistance of counsel claim, Heath argues that we can consider it as an independent constitutional violation. The state argues that the claim is not properly exhausted and would be procedurally barred if it were brought back to the state courts. We, however, find that this claim was properly exhausted. The claim was raised before the trial court during the Alabama error coram nobis proceeding and the Alabama Court of Criminal Appeals, the last state court to issue an opinion, explicitly stated that it considered, and rejected, each of the claims raised in the collateral review petition. The Court of Criminal Appeals, moreover, adopted, and attached to its opinion, the

trial court opinion which discusses this claim. *Heath v. State*, 536 So.2d 142 (Ala.Cr.App.), *cert. denied*, 536 So.2d 142 (Ala.1988).

**7.** Such numbers create a false impression. Early into the voir dire, Heath's lawyers fell into a pattern of asking four or five questions (did you hear about this case in the media, did you hear that Heath pled guilty in Georgia, can you be a fair and impartial juror, and have you decided that Heath was guilty) and then in every case where the veniremember stated that he or she had heard of the case, Heath's lawyers moved to excuse the individual for cause. In short, Heath's motions to excuse a juror for cause quickly became a routine not necessarily tied to any direct indications of bias.

does not eventually sit on the jury. The Court in *Ross* held that a habeas petitioner's constitutional rights were not violated when he was forced to waste a peremptory challenge to remove a veniremember whom the court should have removed for cause. Therefore, in this habeas petition, Heath can raise only the trial court's denials of Heath's challenges for cause of those veniremembers who eventually sat on the jury.

■ After a close examination of the record, we conclude that there is at least "fair support" in the record for the trial court's decision to deny Heath's motions to strike each of the jurors for cause. We are unable to find a single member of the jury whose answers indicated that his or her prior knowledge or pre-dispositions would impair his or her performance as a juror. While all of the jurors had heard of the case in the media and several of them had heard that Heath had pled guilty in Georgia to the same crime,[8] all of the jurors stated that they would be unbiased and that they would follow the judge's instructions. Moreover, from the skeletal nature [9] of the questions and answers, we are hard pressed to find any indication of any bias against Mr. Heath. In the *Bundy* case, we found no error in a trial judge's refusal to strike for cause a juror who had a negative impression about the defendant, might be influenced by the defendant's lack of testimony, and was uncertain if he or she had a fixed opinion about the defendant's guilt. *Bundy*, 850 F.2d at 1428 (Juror No. 3). In that case, we focused on the juror's promise to follow the judge's instructions and to judge the evidence fairly. *Id.* In the case at hand, the jurors made the same promises, and we are unable to find anything in the record suggesting that the jurors did not intend to keep these promises.

Second, Heath argues that he received an unfair trial because the news media closely followed the crime, investigation, and trials and published distorted and prejudicial information. Heath has compiled over 100 newspaper articles and four videotapes of television newscasts. He argues that the reports resulted in an unfair trial because the articles focused on the sensational aspects of the murder. Heath claims that

---

8. While we have stated that we are "hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged," *United States v. Williams*, 568 F.2d 464 (5th Cir.1978), we cannot automatically conclude that, in this habeas case, the jury's awareness of Heath's plea of guilt resulted in an unfair trial. *Williams* can be distinguished because it arose on direct appeal, and the petitioner in a habeas case must show a constitutional violation which requires a higher showing than that required in a case arising on direct appeal. Before we can conclude in a habeas case that a juror's knowledge of guilt is sufficient to mandate a retrial, we must conclude that the juror's knowledge "'would prevent or substantially impair the performance of his [or her] duties as a juror.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). We might be prepared to make such a finding in a case where the juror's knowledge of a prior conviction is buttressed by other indications of actual bias. However, in the case at hand, we find no evidence in the record to suggest that the jurors in question were in fact biased. Based on the record, we can conclude only that the jurors had read the local papers and were aware that Heath had pled guilty in Georgia.

9. Heath acknowledges the fact that the record of the voir dire is distinctly unhelpful in this appeal because the questions asked by his attorneys were neither searching nor very effective. By way of example, a typical question was "[now] you wouldn't be biased at all?" Heath attempts to raise as error the fact that, early in the voir dire, the trial court sustained the state's objection to Heath's question into what a veniremember had read about the case. The state objected to the form of the question because it called for a narrative. Even if the ruling was incorrect and unfairly narrowed Heath's voir dire, it is unclear that the trial court's ruling rises to the level of a constitutional error. *Cf. Mu'min v. Virginia,* — U.S. —, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (holding that it is not a violation of the Sixth Amendment or the Due Process Clause for a judge to refuse to inquire into the venire's knowledge of the specific contents of pre-trial publicity). Furthermore, the trial court ruled against only the form of the question; at other points in the voir dire, the trial court allowed more specific questions into the veniremember's knowledge and allowed other general questions when they were phrased correctly. The failure of the voir dire to elicit proof that the venire harbored alleged biases against Heath cannot be attributed to this ruling by the trial court.

many of the articles were melodramatic. The articles, Heath alleges, focused on the fact that Mrs. Heath was nine months pregnant when she was murdered. The articles referred to the dead fetus by the name that Heath had said he and his wife had agreed upon, and they called the murder a double homicide. In one article, the Georgia prosecutors lamented their inability to bring charges for the death of Mrs. Heath's fetus due to the lack of a feticide statute.[10] Other articles referred to Heath as a "con man." His parents and brother told the press that they thought he was possessed by the devil. Heath claims the coverage became more prejudicial following his plea of guilty. The parents of the victim told how they were upset that Heath was not sentenced to death. Several letters to the editor attacked the plea agreement. The public's reaction to the plea agreement eventually forced the prosecutor and the judge to make statements defending their actions. In the course of this outcry against the plea agreement, Alabama indicted Heath and sought his extradition for capital murder. The media reported that the Alabama trial was necessary because of Georgia's failure to seek the death penalty.

In addition, Heath complains of several sideshows that were extensively covered in the media. First, he notes that the Troup County, Georgia family court held open hearings in the custody battle between his parents and his in-laws over his son and again in the later fight to strip Heath of all of his parental rights. Both family court hearings quickly degenerated into mud slinging. Second, he notes the extensive attention that was focused on Denise Lambert's award in a beauty pageant, her reputed family connections and wealth, and the judicial system's supposed lenient treatment of her.

Heath argues that this pretrial publicity infected the venire and the jury. He notes that 93% of the venire members (75 of 81) heard about the case, 70% of the venire members (57 of 81) knew that Heath had

entered a plea of guilty or was convicted in Georgia. He also notes that 83% of the actual jurors (10 of 12) knew, prior to being summoned for jury duty, that Heath's guilt had been determined in Georgia. And, Heath notes, the rest of the jurors were told of the guilty plea during voir dire.

■ Heath argues that the pretrial publicity deprived him of a fair trial under both an inherent prejudice and an actual prejudice analysis. Inherent prejudice occurs when the pretrial publicity "is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985). Inherent prejudice rarely occurs. *Id.* Our Circuit has treated the inherent prejudice analysis as a mixed question of fact and law, *Coleman*, 778 F.2d at 1537 n. 17, but we review the record cognizant of the fact that inherent prejudice is rarely found. *Id.* Even if Heath cannot show inherent prejudice, he may be able to prove that the pretrial publicity resulted in an unfair trial if he is able to show actual prejudice. Actual prejudice occurs when the prejudice actually enters the jury box and affects the jurors. *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985). This Court should look at the totality of circumstances to determine the extent of the prejudice. *Id.* The petitioner cannot establish actual prejudice without proving that at least one juror should have been dismissed for cause. *Bundy v. Dugger*, 850 F.2d 1402, 1427 (11th Cir.1988).

■ Heath claims that he can demonstrate inherent prejudice because he claims that he meets both the inflammatory and the saturation requirements of the inherent prejudice analysis. We disagree and hold that he has not met either prong of the inherent prejudice analysis.

We are guided by some standards to evaluate whether news coverage is allegedly inflammatory. For instance, the courts have distinguished, and deemed ac-

---

**10.** The Georgia legislature quickly passed such a statute in the aftermath of the Heath murder.

*See* Ga.Code Ann. § 16–5–80.

ceptable, any pretrial publicity which is purely factual in nature, *see Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), from pretrial publicity which includes prejudicial or inflammatory commentary. *See Coleman, supra.* The courts are also extremely wary when the media saturates a town with highly prejudicial evidence such as inadmissible evidence, *see Coleman, supra*, or the defendant's confession, *see Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). This highly prejudicial evidence increases the risk of a trial by the media to the exclusion of a fair trial where the rules of evidence and cross-examination govern the admission and weight of the evidence that is ultimately placed before the jury. As we recently noted in a related context, the Fourteenth Amendment incorporates the Sixth Amendment right of a defendant to be tried in "a fair trial in which the jury reaches its verdict based only on the evidence subjected to the crucible of the adversarial process." *Woods v. Dugger*, 923 F.2d 1454 (11th Cir.1991).

We find that the record does not support Heath's claim that the news coverage was inflammatory. The vast majority of the articles were purely factual presentations of the news about the killing. In addition, Heath is unable to cite any articles in which the media discussed highly prejudicial evidence in a manner that raises concerns about potential jurors being influenced by information not subjected to the "crucible of the adversarial process." While Heath is able to find several articles which are inflammatory (*e.g.*, the articles about Heath being possessed by the devil) these articles are not typical of the vast majority of the articles. Moreover, Heath's claims that the press expressed outrage at his plea bargain and that the media later supported Alabama's later prosecution are not an accurate reflection of the record. Despite isolated letters-to-the-editor expressing outrage, the general tone of the media's reporting is quite restrained.[11]

We find against Heath for a second, independent reason. Heath has not demonstrated that the media coverage saturated the market. A petitioner must prove (1) that a substantial number of the people in the relevant community could have been exposed to some of the prejudicial media coverage, and (2) that the effects of the media saturation continued until the trial. We have, on at least one occasion, rejected an inherent prejudice claim because of a failure of proof. *See Mayola v. Alabama*, 623 F.2d 992 (5th Cir.1980) (holding that the record was unclear how widely read the *Birmingham News* and the *Post–Herald* were in Blount County, Alabama in 1962). Heath has met the first portion of the saturation requirement. Heath has produced evidence that Columbus, Georgia and Phenix City, Alabama are a single media market and that the relevant television stations and local newspapers cover the entire area. Heath has also produced evidence that each of the major local media sources covered the murder and ensuing investigation equally thoroughly. However, Heath has failed to meet the second portion of the saturation requirement. Courts have recognized that in certain limited circumstances, the effect of inflammatory pretrial publicity may be lessened if the media focuses on other news in the months prior to the trial. *See Patton v. Yount, supra. But see Coleman, supra* (declining to apply the "cooling off" rationale when there was evidence that the local emotions continued to run deep and the "cooling off" period was marred by intense publicity immediately before the trial). The record in this case supports such a cooling off rationale. The crime occurred on August 31, 1981 and Heath was arrested four days later. In the next several weeks, the story was placed on the front page of the two local papers nearly every day. Heath pled guilty in February of 1982, and his co-defendants went to trial during the spring. Throughout this period, the case seemed to command the local news media's attention. In May of 1982, days after the final trial finished in Georgia, Alabama brought

---

**11.** For example, one editorial actually came out against the Alabama prosecution because the

paper thought it violated the double jeopardy clause and basic principles of fairness.

charges against Heath. The case stayed in the news until the end of May. However, from June of 1982 until the trial began in February of 1983, the case received little or no attention in the news media. On average, there were only one or two articles in the local papers each month. Moreover, in the days prior to the trial, the media mentioned the upcoming trial in only one or two short articles. Therefore, in order for Heath to prevail on this claim, he must show that the articles published prior to June of 1982 resulted in an unfair trial held eight months later. Heath is unable to show that these articles, which were, for the most part, not inflammatory, marred his trial sufficiently for us to conclude that this is one of those extremely rare cases in which we should find inherent prejudice.

Finally, Heath alleges that the publicity created actual prejudice. He notes that a large number of veniremembers heard about the crime and his plea agreement. According to *Patton v. Yount*, however, the question is not whether a juror remembered the case from the media. *Patton*, 467 U.S. at 1033, 104 S.Ct. at 2889. Rather, the *Patton* Court held that after examining the voir dire, the court should determine whether the jurors had fixed opinions to the extent that they were unable to judge the defendant's guilt impartially and recommend an appropriate sentence. Similarly, this Court in *Bundy, supra*, recognized that seating of a juror by a state court over a challenge for cause will be affirmed as long as there is fair support in the record for the court's decision. As we have already noted, all of the seated jurors denied having a fixed opinion as to Heath's guilt and they all promised to follow the judge's instructions.

Therefore, under *Cross*, 893 F.2d at 1290, we do not find appellate counsel's failure to bring this claim on appeal prejudicial be-cause the claim would not have been successful if it were brought on appeal.

b. *The Violation of the Privilege Against Self Incrimination*

During the Georgia trial of Owens and Lumpkin, the Georgia district attorney called Heath to the stand.[12] Heath invoked his Fifth Amendment right not to testify. The district attorney argued that Heath was not entitled to the protection of the Fifth Amendment because he had already pled guilty to the murder and Georgia was not going to bring any other charges against him for this crime. Heath disagreed; he argued to the court that he was entitled to the protection of the Fifth Amendment because there was a possibility that Alabama might bring charges against him for the same crime. During Heath's Alabama trial, the district attorney, over a defense objection, asked Officer Malueg, one of the investigating officers who was present when Heath testified in Georgia, about Heath's testimony during Owens' and Lumpkin's trial in Georgia. Officer Malueg testified that Heath "had refused to testify based on the fact ... that there was an implication that other charges might be filed at a later time because of the fact that his wife was abducted from— and taken from Alabama." In his closing argument to the jury, the district attorney mentioned Officer Malueg's testimony in order to prove that the kidnapping had occurred in Alabama.

We do not need to determine whether Heath's Fifth Amendment rights were violated because it is clear that any error was harmless beyond a reasonable doubt. Both parties admit that Heath's testimony was relevant only to establish that the kidnapping started in Heath's home in Russell County, Alabama. We note that there is extensive evidence supporting the state's

---

**12.** In addition to our considering this claim in the context of an ineffective assistance of counsel claim, Heath argues that we can consider it as an independent constitutional violation. The state argues that this claim was neither presented nor exhausted in state court and currently would be procedurally barred if Heath attempted to return to state court to litigate it. Heath claims that we should not imply a procedural bar because Alabama law is not consistently applied. Because this claim is easily resolved on the merits, we do not address the state's contentions that the claim is procedurally barred. *See Kennedy v. Dugger*, 933 F.2d 905, 910 n. 5 (11th Cir.1991).

contention that the kidnapping started in Russell County. The most important piece of evidence was Heath's extensive confession to Officer Malueg on the night of his arrest during which he admitted that the kidnapping started in his home. Moreover, some circumstantial evidence confirmed that the kidnapping started in Heath's home. The investigating officers found a crushed cigarette on Heath's kitchen floor, and Heath admitted that neither he nor his wife smoked. Also, on the morning of the kidnapping, two neighbors noticed Heath speaking with some men in a car parked down the street from Heath's house. These men were seated in a car that was seen later that morning speeding away from the wrecked car containing Mrs. Heath's body. Furthermore, the police found tire tracks leading up to the Heath house, they found a door unlocked, they found a fan blowing in Mrs. Heath's bedroom, and they found that Mrs. Heath had not worn some jewelry that she customarily wore when she left the house. The prosecutor, in his closing, emphasized each of these pieces of evidence. In light of all this evidence, we conclude that the error was harmless beyond a reasonable doubt. Because the error was harmless, the Fifth Amendment claim would not have been successful on appeal. We therefore hold that appellate counsel's failure to raise this claim was not prejudicial.

### B. Subject Matter Jurisdiction

#### 1. Procedural Bar

The Alabama Court of Criminal Appeals, the last state court to issue an opinion, reviewing the denial of the petition for a writ of error coram nobis, stated that Heath should have raised his subject matter jurisdiction claim on direct appeal. The court stated that this failure bars review, but then stated "[n]evertheless, we hold that Alabama did in fact have jurisdiction

to prosecute this appellant." *Heath v. State*, 536 So.2d 142, 143–44 (Ala.Crim.App. 1988). The district court below found that this holding creates a procedural bar. Heath disagrees. Heath argues that the state court recognized that a procedural bar existed, but the court chose to waive the bar and proceed to the merits. Heath notes that the use of the word "nevertheless" implies that "in spite of" the procedural bar, the court intentionally reached the merits.

In *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), a state court mentioned a procedural bar and then proceeded to the merits. In order to resolve the question of whether the state court reached the merits or relied on the procedural bar, the Supreme Court adopted the plain statement rule set out in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Therefore, if a state court opinion is ambiguous about which of two grounds it relied upon, the federal courts must presume that the state court reached the merits. *Harris*, 489 U.S. at 263, 109 S.Ct. at 263. The Court, however, recognized that in some cases the state courts will discuss the merits as an alternative holding. The Court held that, in those cases, the federal courts should defer to the procedural bar. *Id.* at 254 n. 10, 109 S.Ct. at 1044 n. 10. But a state court's discussion of the merits is "an alternative holding" only if, after reading the opinion as a whole, the federal court concludes that the state court " 'clearly and expressly' state[d] that its judgment rest[ed] on a state procedural bar." *Id.* at 263, 109 S.Ct. at 1043. Applying the *Harris* test, we cannot conclude that the state court "clearly and expressly" indicated that the merits were an alternative holding, therefore we must presume that the state court reached the merits.[13]

---

**13.** The Supreme Court's recent opinion in *Coleman v. Thompson*, — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (June 24, 1991), does not change this analysis. *Coleman* altered *Harris* to require the federal habeas courts to first make a finding that the state court's procedural bar analysis either is interwoven with an analysis of

federal law or the state court primarily relied on federal law before applying *Michigan v. Long's* plain statement rule. Since the state court's finding, in the case at bar, was interwoven with federal law, we can properly use the plain statement rule.

### 2. The Merits

Heath argues that Alabama lacked subject matter jurisdiction over this offense: Heath claims that all the elements of the murder (a murderous act accompanied by a contemporaneous intent to kill, *see* Alabama Code § 13A–6–2(a)(1)), occurred in Georgia. The state argues that Heath was convicted of the capital crime of kidnapping/murder which is not defined in section 13A–6–2(a)(1) (murder), but at section 13A–5–40(a)(1) (capital offenses). Under the state's theory Alabama properly had jurisdiction because part of the kidnapping/murder crime occurred in Alabama.

At the outset a few things appear clear. Heath admits that Alabama can obtain jurisdiction over a kidnapping charge if the kidnapping began in Alabama, while the state admits that Alabama cannot obtain jurisdiction for a murder which occurs solely in another state. *See Dolvin v. State,* 391 So.2d 666, 674 (Ala.Crim.App.1979) (holding that murder is an indivisible offense and therefore only one state can properly have jurisdiction), *aff'd,* 391 So.2d 677 (Ala.1980).

There are two dimensions to this jurisdictional question. First, we must determine whether the state has created a murder/kidnapping crime. Second, assuming the state has created such a crime, we must determine whether the punishment of Heath for this crime violates traditional limits on state sovereignty.

■ Heath argues that the state has not created a crime of murder/kidnapping. Heath notes that both kidnapping and murder are separate offenses and that they are defined in the "Offenses Involving Danger to the Person" chapter of Title 13A of the Alabama Code. Heath compares the definitions of kidnapping and murder with the section of the "Punishments and Sentences" chapter which permits the death penalty to be applied to those who commit murder during a kidnapping. Heath concludes that Alabama has only a crime of murder which becomes a capital offense

when the state can prove, at the sentencing hearing, that the aggravating factor of kidnapping is present. Heath claims that the mere presence of an aggravating factor is insufficient to support subject matter jurisdiction.

As a matter of Alabama state law, Heath's argument is meritless. The Alabama Criminal Code specifies that "murder by the defendant during a kidnapping" is a capital *offense. See* Ala.Code § 13A–5–40(a)(1). Heath's argument that the kidnapping is not an offense and is merely an aggravating factor is incorrect because, in Alabama, in death penalty cases the jury must first find the defendant to be guilty of certain capital offenses (such as murder/kidnapping), and then the defendant is sentenced during a sentencing proceeding in which the sentencer weighs the aggravating factors against the mitigating factors. *See Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). Furthermore, the Supreme Court of Alabama has strongly implied that the capital offenses are indeed separate offenses, despite their codification in the chapter on Punishments and Sentences. *See Ex Parte Arthur,* 472 So.2d 665 (Ala. 1985). In Alabama, the aggravating circumstance must be set out in the indictment, *id.* at 667, and must be proved beyond a reasonable doubt as a "statutory element of the crime" of capital murder during the guilt phase. *Id.* Thus as a matter of Alabama state law, kidnapping/murder is one offense and, as a matter of state law, Alabama has jurisdiction.[14]

■ Heath next argues that his prosecution in Alabama for a murder in Georgia offends various due process concepts which limit the territorial reach of state criminal prosecutions. Heath notes that the Supreme Court has on several occasions held that the "jurisdiction of a state is co-extensive with its territory." *Manchester v. Massachusetts,* 139 U.S. 240, 264, 11 S.Ct. 559, 564, 35 L.Ed. 159 (1891).

---

**14.** *See* Ala.Code § 15–2–3. ("When the commission of an offense commenced in the State of Alabama is consummated without the boundaries of the state, the offender is liable to punishment therefor in Alabama.").

Heath's focus on the question of territorial borders obscures the nexus between this crime and the jurisdiction of Alabama. The focus should be on Justice Holmes' opinion in *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), and its progeny. *Strassheim* held that Michigan properly obtained jurisdiction when the defendant never entered the state but the crime had sufficient direct repercussions within the state. The defendant in *Strassheim* attempted to bribe a Michigan official who was in charge of making state purchases. The Court held that when an individual's criminal acts directly violate the peace, tranquility and laws of a state, the state may prosecute that individual, even if the individual commits the act in another jurisdiction. In the case at bar, a portion of the crime of kidnapping/murder occurred in Alabama. It is undisputed that this act directly violated the peace, tranquility, and laws of Alabama. Under *Strassheim* the state has established a sufficient nexus to satisfy any requirement of subject matter jurisdiction.

## C. *Ineffective Assistance at Trial*

Finally, Heath argues that he received ineffective assistance of counsel at trial.[15] In order to prevail on this claim, Heath must show that his trial counsel's performance was deficient and that this deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. Heath claims that his trial counsel was ineffective in both their pretrial preparations and guilt phase defense of Heath.

**15.** Heath had the assistance of two lawyers at trial.

**16.** Heath claims that he pled guilty in Georgia on the condition that he not receive the death penalty. Heath claims that the plea was not entered knowingly because his counsel did not investigate Alabama's intentions regarding the death penalty. However, it is unclear that had Heath's Alabama counsel attacked the Georgia guilty plea such an attack would have been successful. During this habeas proceeding, the state placed into evidence affidavits from Georgia prosecutors who swear that, during the plea negotiations, they did not make any representations about potential criminal penalties in Alabama. Moreover, we note that the voluntariness of the plea depends only upon whether the

We conclude that his counsel's pretrial preparations were deficient but that Heath is unable to show any prejudice from this performance. We also conclude that Heath is unable to show that his counsel's trial performance was either deficient or prejudicial.

### 1. Deficiency

■ Heath alleges that his trial attorneys' performance during pretrial was deficient. During the pretrial, Heath's counsel filed eight motions, none of which were longer than two and a half pages. Only the double jeopardy motion was supported by a brief. It was five and a half pages long and it was the only pretrial motion or brief to cite any legal authority. Heath also complains that counsel should have attacked the Georgia guilty plea which constrained possible defenses and that[16] when his lawyers moved for a change of venue they should have filed at least some of the news articles with their motion. Heath notes that his attorneys had the articles available prior to the trial because Lambert's attorneys had assembled them for her trial. Because the state does not contend that Heath's trial counsel's performance during the pretrial was reasonable, we accept Heath's allegation that their performance was deficient.

Heath also asserts that his counsel was deficient during the guilt phase. Evidently before the trial, Heath's lawyers moved to dismiss the case because of a double jeopardy claim and in the alternative Heath's counsel moved to submit the double jeopar-

defendant is aware of the direct consequences of the plea. *Mabry v. Johnson*, 467 U.S. 504, 509, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984). For example, the use of a plea as a sentencing enhancement for another crime is considered a collateral, not a direct, consequence. *Wright v. United States*, 624 F.2d 557 (5th Cir.1980). Also, the Seventh Circuit has held that the use of a plea to establish an element of a crime in a separate prosecution is also a collateral consequence. *United States v. Jordan*, 870 F.2d 1310 (7th Cir.1989). Finally, while the existence of this plea *could have* constrained possible defenses, there is nothing in the record to demonstrate that the plea actually played any role in constraining Heath's defenses.

dy question to the jury. Both arguments were rejected by the trial court. Nevertheless, in Heath's opening, counsel argued the double jeopardy theory to the jury and told them they would be instructed on double jeopardy by the judge. Counsel began his opening by telling the jury that Heath was tried in Georgia. The prosecutor then interjected that Heath pled guilty. After a sidebar, counsel told the jury that Heath had in fact pled guilty, that he was not supposed to be in risk of the death penalty, and that the Alabama district attorney was prosecuting him despite the plea. In his closing, Heath's counsel discussed the history and the importance of the double jeopardy clause of the Fifth Amendment.[17] Heath's counsel also admitted that Heath was involved in the murder of his wife, that he had pled guilty in Georgia, and that he was serving a life sentence in Georgia. Heath argues that this excessive reliance on the double jeopardy clause was unreasonable.

We find, however, that a more complete examination of the record demonstrates the reasonableness of Heath's trial attorney's tactics. Heath's two trial attorneys spent the bulk of their time during the trial and during their closings putting the state to its burden of proof on the question of whether the kidnapping started in Russell County, Alabama. At closing, they reiterated the fact that Mrs. Heath had intended to drive to Georgia on the morning of her murder, that the body was found in Georgia, and that all of the physical evidence suggested that she was shot in Georgia just prior to the staged accident. Furthermore, Heath's counsel emphasized that there was no evidence of a struggle in Heath's home, that no neighbors saw Mrs. Heath being dragged out of the house, and that the neighbors who did see Heath talking to the men in a car on the morning of the murder did not see anything that would prove a kidnapping occurred in Alabama.[18]

We are unprepared to label Heath's attorneys' performance below reasonable professional norms. Heath's attorneys were faced with a difficult, if not impossible task in defending Heath's innocence, and their strategy appears reasonable. Heath's attorneys would have had a hard time contesting the murder charge in light of the overwhelming physical evidence and Heath's extensive confession.

### 2. Prejudice

 Heath has not attempted to show prejudice due to the ineffectiveness of counsel at pretrial. As the state points out, Heath has not shown that any of the pretrial motions would have succeeded if they were better prepared. Heath has also failed to show any other pretrial motions which would have succeeded if they were submitted. Moreover, after reviewing all the articles and video tapes that Heath claims his trial counsel should have submitted, we are unable to conclude that the failure of the trial court to grant a change of venue constitutes a constitutional error. Therefore, the failure to submit any support with the motion does not raise a "reasonable possibility" that, but for the ineffectiveness, the result of the motion would have been different. *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068.

Even assuming that Heath was able to show that his attorneys' performance was deficient during the guilt phase, he is unable to show prejudice resulting from their actions. This case is similar to *Magill v. Dugger,* 824 F.2d 879 (11th Cir.1987). In *Magill,* trial counsel's performance was much more deficient because the attorney in effect conceded his client's guilt during his opening and closing arguments. This Court, however, did not find prejudice due to this action. The *Magill* court held that because of substantial evidence of guilt,

---

**17.** The prosecution rebutted the double jeopardy argument by pointing out that the judge had already ruled on it and would not be instructing the jury on double jeopardy.

**18.** Heath's counsel also noted that the cigarette butt found in Heath's kitchen was irrelevant

because no one tied the cigarette to the alleged kidnappers. They also argued that the fact the fan was left on is irrelevant because there was no air conditioning in the house, and the crime occurred in Alabama in mid-August.

including the defendant's confession, it was "highly unlikely that [counsel's] deficient performance affected the jury's verdict during the guilt phase." *Id.* at 888.

## III. CONCLUSION

We therefore AFFIRM the district court's denial of the writ.

EDMONDSON, Circuit Judge, concurring in part and concurring in the judgment:

I join in the result and in most of what Judge Johnson has written. But I disagree with two points.

First, I cannot agree that the quality of counsel's performance can be judged much by the length of briefs or the number of issues raised. Especially in the death penalty context, too many briefs are too long; and too many lawyers raise too many issues. Effective lawyering involves the ability to discern strong arguments from weak ones and the courage to eliminate the unnecessary so that the necessary may be seen most clearly. The Supreme Court—as today's court recognizes—has never required counsel to raise every nonfrivolous argument to be effective. *See Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986). That the custom in death penalty cases is for lawyers to file long briefs with lots of issues means little to me. This kind of "custom" does not define the standard of objective reasonableness. *See Gleason v. Title Guar. Co.,* 300 F.2d 813 (5th Cir.1962). While compliance with custom may generally shield a lawyer from a valid claim of ineffectiveness, noncompliance should not necessarily mean he is ineffective. Not all customs are good ones, and customs can obstruct the creation of better practices. Today's court disposes of the ineffective assistance of counsel claims on lack of prejudice grounds. So, what the court says about counsel's performance is dicta: language inessential to determining the case. Still, I worry that some of the dicta sends the wrong signal to lawyers.

Second, on the subject-matter jurisdiction question (part II.B.1. of the court's opinion), I think Alabama spoke plainly enough to raise a procedural bar to federal review of the merits. The state court of appeals said this:

> [A]lthough the appellant raised this issue at trial, his failure to raise it on direct appeal will now bar our review of this issue. *Summers v. State,* 366 So.2d 336 (Ala.Cr.App.1978), writ denied, 366 So.2d 346 (Ala.1979); *Dobard v. State,* 455 So.2d 281 (Ala.Cr.App.1984); *Dunkins v. State,* 489 So.2d 603 (Ala.Cr.App. 1985).
>
> Nevertheless, we hold that Alabama did in fact have jurisdiction to prosecute this appellant for the capital offense of murder/kidnapping.

*Heath v. State,* 536 So.2d 142, 143 (Ala.Cr. App.1988).

The phrase "will now bar our review" seems plain to me. The state appellate court's discussion of the merits on the question of jurisdiction is just an alternative holding. *See Harris v. Reed,* 489 U.S. 255, 264, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989) (state court's alternative holding on merits does not negate procedural bar as adequate and independent state ground as long as state court explicitly invokes state procedural bar rule as separate basis for decision).