809 A.2d 627

Alvin Winslow GROSS

v.

STATE of Maryland.

No. 130, Sept. Term, 2000.

Court of Appeals of Maryland.

Oct. 11, 2002.

Fred Warren Bennett (Michael E. Lawlor of Bennett & Nathans, LLP, on brief), Greenbelt, for petitioner.

Celia Anderson Davis, Assistant Attorney General (Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

Petitioner, Alvin Winslow Gross, filed a Petition for Postconviction Relief in the Circuit Court for Anne Arundel County. The Circuit Court granted him a new trial, based on *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny on the grounds that he was denied effective assistance of trial and appellate counsel. The Court of Special Appeals reversed, reinstating the judgments of conviction. *State v. Gross,* 134 Md.App. 528, 760 A.2d 725 (2000). We granted the petition for writ of certiorari to consider whether petitioner was denied effective assistance of counsel.

In the early morning hours of December 19, 1993, the body of a young woman was discovered in a cornfield in Anne Arundel County. The autopsy revealed that her blood alcohol content was .34% and her urine alcohol content was .42%. When her body was found, she was nude from the waist up, her underwear was wrapped around one leg, and she had on no shoes, blouse, bra, or coat. The cause of death was four gunshot wounds—two to her neck and two to her chest. There was no purse or identification with the body. The victim was identified several days later as Margaret Ruth Courson when a friend recognized her from a photograph that appeared in the local Annapolis newspaper.

The victim had last been seen near the City Dock in Annapolis, at approximately 3:30 a.m., on December 19, 1993. The cornfield where her body was discovered three hours later was approximately twenty miles away from the City Dock area of Annapolis.

In response to media releases on December 20, 1993, the police received several telephone calls identifying petitioner, Alvin Winslow Gross, as the murderer. On December 31,

1993, they received an anonymous telephone call stating that Sidney Scott, Jr. and two other black men were involved in the murder. On January 6 and 7, 1994, the police spoke with three anonymous informants who implicated petitioner, among others, in the murder.

On January 10, 1994, the police executed search warrants for petitioner's person, car, and residence. During the search of petitioner's car, police found physical evidence linking the victim to petitioner's vehicle. They found a notebook containing handwriting matching that of the victim and fingerprints of the victim on nine separate pages. The police also found two head hairs and one pubic hair in petitioner's automobile, which were later identified as belonging to the victim. In addition, police gathered carpet fibers from the floor mats in petitioner's automobile, which were subsequently matched to fibers found on several items of clothing worn by the victim on the night of the murder and found in combings of her pubic hair.

On the same day, petitioner was arrested and transported to the police station, where samples of his blood, hair, and saliva were obtained and submitted to the crime laboratory for DNA testing.[1] A vaginal swab was also taken from the victim's body and examined for possible DNA traces. Initially, the

---

1. Deoxyribonucleic acid ("DNA") is the organic material that provides the genetic instructions for all individual hereditary characteristics. *See Armstead v. State,* 342 Md. 38, 51, 673 A.2d 221, 227 (1996); *United States v. Hicks,* 103 F.3d 837, 844 (9th Cir.1996); *Commonwealth v. Curnin,* 409 Mass. 218, 565 N.E.2d 440, 441 n. 1 (1991); *State v. Carter,* 246 Neb. 953, 524 N.W.2d 763, 775 (1994), *overruled on other grounds, State v. Freeman,* 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Vandebogart,* 136 N.H. 365, 616 A.2d 483, 485 (1992); *State v. Cauthron,* 120 Wash.2d 879, 846 P.2d 502, 508 (1993). The importance of DNA for forensic purposes is that DNA does not vary within an individual and, with the exception of identical twins, no two individuals have the same DNA configuration. *See Nelson v. State,* 628 A.2d 69, 75 (Del.1993); *State v. Williams,* 574 N.W.2d 293, 297 (Iowa 1998); *Curnin,* 565 N.E.2d at 441 n. 1, 445; *Carter,* 524 N.W.2d at 775; *Vandebogart,* 616 A.2d at 485–86; *State v. Copeland,* 130 Wash.2d 244, 922 P.2d 1304, 1315 (1996); George Bundy Smith & Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Courts,* 65 Fordham L.Rev 2465, 2465 (1997).

laboratory attempted to perform DNA Restriction Fragment Length Polymorphism ("RFLP") analysis, but there was not enough genetic material present to obtain results with that method. The laboratory then performed a DNA Polymerase Chain Reaction ("PCR") amplification, which can be performed on a smaller DNA sample, followed by an analysis of the DQ Alpha region of the chromosome ("DQA"). *See State v. Isley*, 262 Kan. 281, 936 P.2d 275, 279 (1997).

Prior to trial, petitioner moved *in limine* to exclude the DNA/PCR evidence on two grounds: first, that PCR analysis

---

The molecular structure of DNA is commonly referred to as a "double helix," which resembles a spiraling ladder, and which is composed of twisted double strands of repeated sequences of "nucleotides." *See Armstead*, 342 Md. at 51, 673 A.2d at 227; *State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486, 490 (1998); *Williams*, 574 N.W.2d at 297; *Curnin*, 565 N.E.2d at 445; *Carter*, 524 N.W.2d at 775; *Vandebogart*, 616 A.2d at 486; *Copeland*, 922 P.2d at 1315; Smith & Gordon, *supra*, at 2465–66. The sides of the ladder are composed of the "nucleotides," which are organic bases that pair with one another to form the "rungs" of the double helix. *See Curnin*, 565 N.E.2d at 445–46; *Carter*, 524 N.W.2d at 775; *Cauthron*, 846 P.2d at 508; Smith & Gordon, *supra*, at 2466. It is the repeating sequence of base pairs along the DNA double helix that comprise "genes," which determine the unique physiological traits of human beings. *See Armstead*, 342 Md. at 51–52, 673 A.2d at 227; *Hicks*, 103 F.3d at 845; *Tankersley*, 956 P.2d at 490 n. 2; *Carter*, 524 N.W.2d at 775; *Vandebogart*, 616 A.2d at 486; *Cauthron*, 846 P.2d at 508; Smith & Gordon, *supra*, at 2466. The specific position that a gene occupies is called its "locus." *See* Smith & Gordon, *supra*, at 2466. An individual's entire complement of DNA is known as the "genome." *See Vandebogart*, 616 A.2d at 486; Smith & Gordon, *supra*, at 2467. The vast majority of the base pair sequences of human DNA are identical for all people. *See Armstead*, 342 Md. at 52, 673 A.2d at 227; *Hicks*, 103 F.3d at 845; *Nelson*, 628 A.2d at 75; *Williams*, 574 N.W.2d at 297; *Carter*, 524 N.W.2d at 775; *Copeland*, 922 P.2d at 1315; Smith & Gordon, *supra*, at 2466. There are, however, a few DNA segments or genes, called "polymorphic loci," which are highly variable among individuals. *See Nelson*, 628 A.2d at 75; *Williams*, 574 N.W.2d at 297; *Curnin*, 565 N.E.2d at 446; *Carter*, 524 N.W.2d at 775;. *Vandebogart*, 616 A.2d at 486; *Cauthron*, 846 P.2d at 509. The alternative forms of these individual polymorphic gene fragments are called "alleles." *See Tankersley*, 956 P.2d at 490 n. 2; *Curnin*, 565 N.E.2d at 446; *Cauthron*, 846 P.2d at 509; Smith & Gordon, *supra*, at 2466. It is these polymorphisms that have great significance for forensic DNA analysis because they provide the basis for DNA identification. *See Armstead*, 342 Md. at 52, 673 A.2d at 227; *Hicks*, 103 F.3d at 845; *Nelson*, 628 A.2d at 75;

was generally not accepted in the scientific community and, therefore, not admissible; and, second, that the test results were inadmissible because the laboratory had not produced population genetics statistics to accompany the lab results and that, absent these statistics, the results of the test were meaningless. At the hearing on the pre-trial motion, the defense called as an expert witness, Dr. Walter Rowe, a professor of forensic sciences. The trial court admitted Dr. Rowe as an expert to testify about population statistics in a general sense but did not accept him as an expert in the field of DNA or DNA/PCR analysis. The trial court denied petitioner's motion *in limine.*

The bullets removed from the victim's body were too mutilated for a ballistics match, but the State's firearms identification expert testified at trial that they were .32 caliber bullets that could have been fired from one of five probable makes of revolvers, including one manufactured by Rossi. The police later recovered a Rossi revolver that petitioner had turned over to Troy King in early January 1994. King was a close personal friend of petitioner's for several years and was not in any way a suspect in the case. Although the ballistics expert could not state that the four bullets had been fired from petitioner's revolver, he did testify that they were compatible with it.

At trial, Troy King testified that, during the last week of December 1993, petitioner had discussed the Courson murder with him, telling him during a telephone conversation that he had been doing "crazy things" lately, that he and Sidney Scott were with the victim on the night of December 19, 1993, and that they both shot and killed her. King testified that petitioner had told him that he and Scott had picked up the victim and that they felt they had to kill her because they were afraid that the victim would identify them. King also testified that, early in January 1994, he, his cousin Charles Carpenter, and petitioner had gone out to a night club in Washington, D.C.

---

*Curnin,* 565 N.E.2d at 441 n. 1, 446; *Cauthron,* 846 P.2d at 509; Smith & Gordon, *supra,* at 2467.

Both King and Carpenter testified that petitioner gave King a .32 caliber Rossi revolver from his car and asked King to keep it for him. Both also testified that, at the time that petitioner gave the revolver to King, he had warned King to be careful with it because "it already has one life on it."

The State also called as a witness Angela Nicolson, King's fiancee. She testified that she found a handgun in the apartment that she shared with King and that, after petitioner's arrest, she turned the gun over to police.

The State introduced other physical evidence linking the victim to petitioner. This evidence included hair found in a notebook in petitioner's car. Both the notebook and hair sample belonged to the victim. Fibers from petitioner's car mats were found on the victim's clothing.

The State presented evidence that DNA samples were collected from the victim's body and testing using the PCR DQA method. Two DNA experts from Cellmark Diagnostic Laboratory, Melissa Weber and Charlotte Word, testified at trial regarding the PCR DQA testing. At trial, the defense moved *in limine*, before the State's Cellmark DNA experts testified, to prevent the State from entering evidence of population frequency statistics. Defense counsel did not object to, or move to strike, the experts' testimony regarding the DNA laboratory results without accompanying statistical data. Dr. Weber testified that all that could be extrapolated from the PCR tests that were performed was that petitioner could not be excluded from the class of persons who possibly could have been a source of the DNA samples recovered from the victim. Word confirmed in her testimony that PCR testing cannot produce a "match" in the sense of a unique identification. Neither Weber nor Word, however, testified regarding the statistical significance of petitioner's DNA match.

Petitioner testified in his defense at trial. His defense was alibi. He denied any involvement in the murder, admitting that he had sexual intercourse with the victim, but claiming that it was consensual and occurred the evening before the murder. He also testified that he gave the revolver to Troy

King, claiming, without further explanation, that Sidney Scott had given it to him in December. He testified that, because he had no use for the gun, he had given it to King, who collected guns, as a gift.

On December 8, 1994, petitioner was convicted by a jury in the Circuit Court for Anne Arundel County of first degree felony murder, first degree rape, kidnapping, and the use of a handgun in the commission of a crime of violence. He was sentenced to a term of imprisonment of life without the possibility of parole for murder, with concurrent sentences of twenty-five years for rape, twenty-five years for kidnapping, and fifteen years for the use of a handgun in the commission of a felony.

Petitioner noted a timely appeal to the Court of Special Appeals, raising a multitude of issues. In an unreported opinion, the Court of Special Appeals held that the evidence was insufficient to sustain petitioner's conviction for kidnapping, affirmed the judgments of conviction for murder and the handgun violation, and merged the rape conviction into the felony murder conviction for sentencing purposes. This Court denied Gross' petition for writ of certiorari. *Gross v. State*, 343 Md. 333, 681 A.2d 68 (1996).

On August 18, 1997, in the Circuit Court for Anne Arundel County, petitioner filed a Petition for Postconviction Relief pursuant to the Uniform Post Conviction Procedure Act, Maryland Code (1957, 1996 Repl.Vol.) Article 27, § 645A (current version at Maryland Code (1957, 2001 Repl.Vol.) § 7–101 *et seq.* of the Criminal Procedure Article). He alleged ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and trial court error. At the postconviction hearing, he argued that his trial counsel mishandled the DNA evidence at trial and that his appellate counsel was deficient in failing to raise the DNA issues on appeal. He also argued that he was denied effective assistance of trial counsel when his attorney failed to object to the State's allegedly improper cross-examination of his character witnesses.

Petitioner raised three issues as trial court error. He argued that the trial court erred in denying his motion to exclude the DNA/PCR evidence, that the trial court erred in refusing to accept Dr. Rowe as a DNA/PCR expert, and that the trial court erred in permitting the State to introduce PCR evidence without accompanying population genetics statistics.

The Circuit Court rejected all three of petitioner's arguments regarding trial court error, finding no error, but granted postconviction relief for ineffective assistance of counsel. The postconviction court found that petitioner's trial counsel was ineffective for failing to object to the use of DNA/PCR testing at trial, for failing properly to investigate, hire, and prepare a qualified, competent DNA/PCR expert, and for failing to object to the introduction of DNA/PCR evidence at trial without accompanying population genetics statistics. The postconviction court repeatedly ruled that petitioner was prejudiced by certain of trial counsel's errors because, in failing to object, trial counsel did not preserve an issue for appeal. In finding a *Strickland* violation, the postconviction court did so without conducting the proper assessment of prejudice under *Strickland,* finding that petitioner was *per se* prejudiced by the failure of trial counsel to preserve these issues for appeal, without any consideration of whether the waived issues had merit and despite its finding that the trial court committed no error.[2]

Gross argued before the postconviction court that trial counsel was ineffective for failing to object to the State's cross-examination of his character witnesses.[3] The State

---

2. As might be expected, petitioner is satisfied with the relief granted by the postconviction court and indicated in his brief that he, therefore, is defending the court's opinion. Counsel acknowledges that the postconviction court's ruling that merely failing to object and not preserving an issue for appeal constituted ineffective assistance of counsel under *Strickland* did not apply settled precedent, nor did the court properly discern the thrust of petitioner's arguments.

3. Trial counsel did object to the cross-examination of one of the witnesses; that objection was overruled and then was withdrawn by trial counsel. Trial counsel did not object to this line of questioning

asked four defense character witnesses who had expressed opinions as to Gross' character whether their opinion would be affected if the witness had observed Gross with a handgun, if the witness had heard Gross say the gun "had a life on it," or if the witness knew Gross had confessed to a friend that he had killed the victim. Petitioner argued that the questions were impermissible "guilt-assuming" questions.

The postconviction court concluded that the cumulative effect of trial counsel's errors denied petitioner his constitutional right to effective assistance of counsel and that petitioner's appellate counsel, on direct appeal, was constitutionally ineffective for failing to appeal the trial court's denial of petitioner's motion to suppress the DNA/PCR evidence and for failing to appeal the trial court's refusal to qualify petitioner's expert in DNA/PCR evidence. The postconviction court also rejected petitioner's argument that trial counsel was ineffective in failing to object to the guilt-assuming questions asked by the State during cross-examination of his character witnesses. The postconviction court granted petitioner a new trial and, in an amended order, granted conditional alternative relief in the form of a belated appeal in the event that the granting of a new trial was set aside.

Both parties sought leave to appeal to the Court of Special Appeals, pursuant to Maryland Code (1957, 1996 Repl.Vol.) Article 27, § 645I (current version at Maryland Code (1957, 2001 Repl.Vol.) § 7–101 *et seq.* of the Criminal Procedure Article) and Maryland Rule 8–204. The Court of Special Appeals granted the State's application for leave to appeal the grant of postconviction relief.[4] The intermediate appellate court reversed the postconviction court's grant of a new trial

---

when the State questioned the other character witnesses in a similar fashion.

4. The Court of Special Appeals also considered Gross' argument that the postconviction court erred in permitting the State's cross-examination questions of his character witnesses. The issue came before the Court of Special Appeals in a somewhat complicated procedural posture, but, by agreement of the parties, was considered by the court. *See State v. Gross*, 134 Md.App. 528, 619–23, 760 A.2d 725, 774–76 (2000).

and the alternative relief of a belated appeal. *State v. Gross,* 134 Md.App. 528, 619, 760 A.2d 725, 773 (2000).

The Court of Special Appeals held that the performance of petitioner's appellate counsel "was not only effective but highly commendable." *Id.* at 561, 760 A.2d at 742. Before turning to the issue of the effectiveness of trial counsel, the intermediate court stated:

"We initially expected that at this point we would be able to move from a consideration of the effectiveness of appellate counsel back to a consideration of the effectiveness of trial counsel by stepping from one neat and water-tight compartment of analysis to another. On closer examination, however, we are unable to do so. Two-thirds of what we expected to be a traditional examination of the effectiveness of trial representation and trial prejudice turns out to be a *hybrid* issue."

*Id.* at 581, 760 A.2d at 753 (emphasis added).

In creating what Gross calls a "hybrid test" to address trial counsel's failure to preserve admissibility issues for subsequent appellate review, the court pointed out the possibility of errors by trial counsel that would not have resulted in prejudice to a petitioner at the trial level, but that, nonetheless, resulted in prejudice at the appellate level, such as when counsel's errors consist only of failing to renew an earlier objection that had been overruled by the trial court. *See id.* at 581–84, 760 A.2d at 753–55. The court defined this "hybrid issue" as requiring a determination of whether there was a " 'reasonable probability' that, but for trial counsel's failure to preserve an issue for appellate review, Gross 'would have prevailed on his appeal.' " *Id.* at 581, 760 A.2d at 753. In doing so, the court framed the issue as one of "a reasonable likelihood of a different appellate result, not a different trial result." *Id.* The court then concluded that the most appropriate remedy would be to grant a belated direct appeal, not a new trial, and thereby allow the appellate court to consider those issues on their merits, notwithstanding their non-preservation. *See id.* at 585–86, 760 A.2d at 755.

After laying out this test for assessing appellate prejudice from deficient trial counsel performance, the court concluded that, since the trial judge's rulings were not in error, trial counsel's performance in failing to preserve issues for appeal was not deficient and that there could not possibly have been any appellate prejudice in trial counsel's failure to preserve them. *See id.* at 608–09, 760 A.2d at 767–68. The Court of Special Appeals also addressed petitioner's contention that trial counsel had been ineffective because he failed to object when the State allegedly conducted improper cross-examination of four of petitioner's character witnesses at trial by asking "guilt-assuming" questions. *See id.* at 619–23, 760 A.2d at 774–76.

Gross filed in this Court a petition for writ of certiorari, presenting three questions relating to the alleged ineffective assistance of counsel. The three questions were as follows:

I. Whether the Court of Special Appeals erred in holding that Petitioner was not denied the effective assistance of trial and appellate counsel?

II. Did the lower court erroneously conclude that trial counsel was not ineffective for failing to object to improper guilt-assuming questions asked by the State of petitioner's several character witnesses?

III. Whether the lower court erred in creating a new "hybrid test" for judging certain claims of ineffective assistance of trial counsel claims which conflicts with long standing Supreme Court and Court of Appeal precedent?

*Gross v. State,* 362 Md. 623, 766 A.2d 147 (2001).

Petitioner contends that the Court of Special Appeals erred in crafting a new "hybrid test" for assessing claims of ineffective assistance of trial counsel that result in appellate prejudice. In contrast, the State argues that the Court of Special Appeals did not invent a new "hybrid" test for assessing claims of ineffective assistance of counsel but instead properly analyzed petitioner's claims of ineffective assistance of counsel under traditional standards.

Whether the Court of Special Appeals did or did not adopt a new "hybrid" test for assessing ineffective assistance of counsel claims does not determine the outcome of this case and need not be further explored by us. The principles governing ineffective assistance of counsel claims under the Sixth Amendment, both with regard to trial counsel and appellate counsel, are those set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Redman v. State*, 363 Md. 298, 309–14, 768 A.2d 656, 662–65, *cert. denied*, —— U.S. ——, 122 S.Ct. 140, 151 L.Ed.2d 92 (2001); *Perry v. State*, 357 Md. 37, 78–87, 741 A.2d 1162, 1184–89 (1999); *Wiggins v. State*, 352 Md. 580, 602–03, 724 A.2d 1, 12, *cert. denied*, 528 U.S. 832, 120 S.Ct. 90, 145 L.Ed.2d 76 (1999); *Oken v. State*, 343 Md. 256, 282–300, 681 A.2d 30, 43–52 (1996), *cert. denied*, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997); *Bowers v. State*, 320 Md. 416, 423–27, 578 A.2d 734, 737–39 (1990). The principles applied in the above-cited cases should govern the Court of Special Appeals' decisions regarding ineffective assistance of counsel claims.

■ The same principles shall determine our decision in the present case. Petitioner must satisfy the *Strickland* test for ineffective assistance of counsel—petitioner must establish that any deficient performance resulted in prejudice. If there is no reasonable possibility that the appellate court would have ruled in his favor, there can be no *Strickland* prejudice.

■ We recently reiterated the standard to be applied in determining whether a person has been denied effective assistance of counsel in *Wiggins*. Writing for the Court, Judge Wilner stated:

"The standard to be applied in determining whether counsel's representation comported with the requirements of the Sixth Amendment is that enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Oken v. State*, 343 Md. 256, 283, 681 A.2d 30, 43 (1996), *cert. denied*, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997). To prove a claim of Constitutionally ineffective assistance of counsel, appellant must establish

'that counsel's performance was deficient and that the deficient performance prejudiced the defense.' *Oken, supra,* at 283, 681 A.2d at 43. To show a deficiency, appellant must (1) demonstrate that counsel's acts or omissions, given the circumstances, 'fell below an objective standard of reasonableness considering prevailing professional norms,' *id.,* and (2) overcome the presumption that the challenged conduct 'be considered sound trial strategy.' *Id.* To show that a deficiency prejudiced the defense, appellant must establish that counsel's error was 'so serious as to deprive [him] of a fair trial, a trial whose result is reliable,' *id.* at 284, 681 A.2d at 43, quoting from *Lockhart v. Fretwell, supra,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180, 189, quoting, in turn, from *Strickland, supra.*"

*Wiggins,* 352 Md. at 602–03, 724 A.2d at 12. Deficient performance is prejudicial to a petitioner if there is a substantial possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674; *Bowers,* 320 Md. at 425–27, 578 A.2d at 738–39 (holding that, in defining the reasonable probability language in *Strickland* with more precision, substantial possibility describes the prejudice standard in *Strickland* ). Although *Strickland* and its progeny promulgated standards for determining the effectiveness of trial counsel, the same standards apply in assessing appellate counsel effectiveness. *See, e.g., State v. Calhoun,* 306 Md. 692, 729, 511 A.2d 461, 479–80 (1986); *United States v. Cook,* 45 F.3d 388, 392 (10th Cir.1995); *United States v. Dixon,* 1 F.3d 1080, 1083 (10th Cir.1993); *United States v. Walling,* 982 F.2d 447, 449 (10th Cir.1992); *Duhamel v. Collins,* 955 F.2d 962, 967 (5th Cir.1992); *Heath v. Jones,* 941 F.2d 1126, 1130 (11th Cir.1991); *Miller v. Keeney,* 882 F.2d 1428, 1433 (9th Cir.1989); *Orazio v. Dugger,* 876 F.2d 1508, 1511 (11th Cir.1989); *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986); *United States v. Birtle,* 792 F.2d 846, 847 (9th Cir.1986).

The question of prejudice, in the context of an ineffective assistance of counsel claim for the failure to pre-

serve or raise an appellate claim, necessarily requires a reviewing court to look at the merits of the underlying claim. *See Hartey v. Vaughn*, 186 F.3d 367, 372 (3d Cir.1999); *Banks v. Reynolds*, 54 F.3d 1508, 1516 (10th Cir.1995); *Cook*, 45 F.3d at 392; *Dixon*, 1 F.3d at 1083; *Heath*, 941 F.2d at 1130 n. 4; *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir.1990); *Matire v. Wainwright*, 811 F.2d 1430, 1439 n. 8 (11th Cir. 1987). As a result, in assessing the effectiveness of trial counsel in failing to preserve issues and of appellate counsel in failing to raise them on appeal, *Strickland's* performance and prejudice prongs naturally overlap because the questions of whether counsel's performance was adequate and whether it prejudiced the petitioner both will turn on the viability of the omitted claims, *i.e.*, whether there is a reasonable possibility of success. *See Cook*, 45 F.3d at 394–95; *Miller*, 882 F.2d at 1434; *cf. Oken*, 343 Md. at 294, 681 A.2d at 49 (holding that, because the State's comments during closing arguments were not improper, defense counsel's failure to object to them was "*a fortiori*" not prejudicial); *State v. Colvin*, 314 Md. 1, 21–22, 548 A.2d 506, 516 (1988) (finding no ineffective assistance of counsel for the failure to object to testimony that was admissible); *Grubbs v. State*, 760 S.W.2d 115, 121 (Mo.1988) (finding no ineffective assistance of counsel for failure to object to testimony that was not inadmissible).

 Of course, the failure to preserve or raise an issue that is without merit does not constitute ineffective assistance of counsel. *See Cooper v. State*, 128 Md.App. 257, 273, 737 A.2d 613, 621 (1999). The Sixth Amendment does not require an attorney to argue every possible issue on appeal. *See Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983); *Banks*, 54 F.3d at 1515; *Cook*, 45 F.3d at 394; *Dixon*, 1 F.3d at 1083 n. 5; *Gray*, 800 F.2d at 647. An advocate does render ineffective assistance of counsel, however, by failing to preserve or omitting on direct appeal a claim that would have had a substantial possibility of resulting in a reversal of petitioner's conviction. *See, e.g., Banks*, 54 F.3d at 1515; *Cook*, 45 F.3d at 395;

*Duhamel,* 955 F.2d at 967; *Heath,* 941 F.2d at 1132; *Cross,* 893 F.2d at 1290; *Page v. United States,* 884 F.2d 300, 302 (7th Cir.1989); *Gray,* 800 F.2d at 646. The crucial inquiry is whether confidence in the reliability of the conviction is undermined by the failure to preserve or raise the claims on appeal. *See Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674; *Banks,* 54 F.3d at 1516; *Heath,* 941 F.2d at 1132; *Oken,* 343 Md. at 284, 681 A.2d at 44.

With these principles in mind, we turn to Gross' arguments in the instant case.

### A. DNA/PCR Evidence

The dispute over the admissibility of the DNA evidence in this case is a tempest in a teapot. Even assuming *arguendo* that the trial court should not have admitted the PCR-related testimony without accompanying population genetic frequency statistics, any such error was not prejudicial because it was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). As such, under the *Strickland* standard, there was virtually no likelihood of success on the merits.

A review of the entire record confirms that the uncontested evidence supporting petitioner's conviction was overwhelming. The State's experts testified that, based on the PCR DQA analysis, they could not exclude petitioner as a donor of the semen found on the victim. They did not testify that petitioner was the source of the semen sample. The DNA evidence was cumulative evidence that did not injuriously affect petitioner's rights. The significant inference from the DNA evidence in this case was that petitioner had sexual relations with the victim close to the time of her death—a fact that petitioner *admitted* in his trial testimony.

Petitioner argues that, but for the introduction of the DNA evidence, his testimony may not have been necessary.[5] This

---

5. Gross testified at the postconviction hearing that the decision of whether he would testify was not made until after the admission of the

argument stands in sharp contrast to the testimony of petitioner's lead trial counsel at the postconviction hearing, who testified that petitioner had planned to testify prior to trial. Counsel testified:

> "[T]he way I looked at it, Alvin needed to explain the pubic hair. Alvin needed to explain the head hair. Alvin needed to explain the blanket fibers. Alvin needed to explain the fibers from the—I think the mat of the car and there [were] other additional fibers. So there were five independent issues—excuse me, six, because the—seven. The—the notebook and the fingerprints. There [were] seven independent pieces of evidence linking him to this victim above and beyond the issue of the DNA. So I think unless there was some compelling reason not to put him on the stand, and I didn't know of any reason not to put Alvin on the stand, . . . coupled with the fact that he wanted to testify. . . . I mean, we certainly guide him along the way, but he direct—he wanted to take the witness stand."

In addition, there was Gross' confession he made to his friend, Troy King. Along these same lines, the Court of Special Appeals noted:

> "Gross could not leave unchallenged the undisputed evidence from the FBI's hair and fiber examiner that Peggy Courson had been in his automobile. He took the stand in his own defense and his testimony, though intended to be exculpatory, was heavy with inculpatory potential. His taking of the stand was a desperate but necessary effort to put some kind of exculpatory spin on that evidence."

*Gross*, 134 Md.App. at 541–42, 760 A.2d at 732. We agree.

The DNA evidence was consistent with Gross' defense. He was not unfairly prejudiced by its admission. Furthermore, there was ample other evidence linking him to the victim near

---

DNA evidence. We point out that Gross never testified that had the DNA evidence been excluded, he would have exercised his Fifth Amendment right and elected not to testify.

the time of her murder. This other evidence independently constituted compelling circumstantial evidence of petitioner's guilt, rendering the admission of the DNA evidence, if error, harmless beyond a reasonable doubt.

Because any error was harmless beyond a reasonable doubt, it stands to reason that petitioner's counsels' errors, (if any), relating to the DNA evidence, could not have prejudiced the outcome of his case in the sense contemplated by *Strickland.* Therefore, he was not unconstitutionally denied effective assistance of counsel.

### B. Cross-examination of Defense Character Witnesses

 Petitioner also alleges that he is entitled to a new trial because his trial counsel were ineffective for their failure to object to what he characterizes as "guilt-assuming" questions asked by the State in cross-examination of his character witnesses.[6] Petitioner argued before the postconviction court, and makes the same argument before this Court, that his trial counsel's deficient performance in failing to object to the guilt-assuming questions prejudiced him because it deprived him "of one of his two (2) defenses at trial," that is, good character testimony and alibi. Petitioner reasons that the improper guilt-assuming questions on cross-examination and the answers given by his character witnesses completely destroyed the credibility of the character witnesses. He concludes that trial counsel's failure to object prejudiced petitioner "in that the complete undercutting of one of [petitioner's] two defenses created a 'substantial or significant possibility that the verdict of the trier of fact would have been affected.'"

The State argues that the postconviction court and Court of Special Appeals properly rejected Gross' argument that trial counsel was ineffective in failing to object to these questions. The Court of Special Appeals addressed the prejudice prong

---

6. Gross identifies as impermissible the following two questions asked of four character witnesses: (1) "If you knew that Mr. Gross was carrying a gun, would that change your opinion of him?" and (2) "If you knew that Mr. Gross had confessed to a murder, would that change your opinion of him?"

of *Strickland,* holding that the outcome of Gross' trial would not have been different had trial counsel objected to the last three of the four affected witnesses. We agree that there is no reasonable possibility that the outcome of the trial would have been different; therefore, Gross was not prejudiced and accordingly, was not denied effective assistance of trial counsel.

We summarize the testimony of the character witnesses. The first witness, Edwin Plater, testified that Gross was "a good person," "straight-forward," and "honest." When asked if his opinion of Gross would change "if you knew that shortly after this murder several people saw him with a gun," that people had heard Gross say "this gun has a life on it," or if Gross had admitted that he shot a woman, Plater testified, over defense objection, that his opinion of Gross would not change.

April Muller, a friend of Gross, testified that Gross had a good reputation and was not violent. In response to the prosecutor's question whether she would be surprised to learn that in December, several people saw him with a gun, she responded, "very." Defense counsel withdrew his objection to this question. Muller testified that her opinion of Gross would not change if she knew that he said the gun had a life on it or that he had confessed to a friend that he killed a person. She said: "It just doesn't sound like Alvin."

Kirk Butler testified that Gross' reputation in the community was good and that he had never known Gross to be violent. Butler testified in response to the State's question, that he would be surprised to learn that several people saw Gross with a gun in December, but that information would not change his opinion of Gross. He also testified that his opinion of Gross would not change if he knew that Gross had confessed to a killing.

Erica Estep, Gross' girlfriend for six years, testified that Gross had many friends, was popular, and was an honest person. In response to the gun question, she said that if she knew that several people had seen Gross with a gun, her

opinion would not change. Her opinion would not change if she knew he had confessed to a murder.

We need not "grade" counsel's performance in failing to object or determine whether counsel's performance was deficient, *see Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 674, because even if the failure to object was deficient performance, Gross was not prejudiced. We agree with the observations of the Court of Special Appeals finding lack of prejudice.

> "The trial judge had just overruled the objection when made with respect to the first witness and the issue was identical with respect to the next three witnesses. There was no reasonable likelihood that the ruling would not have been precisely the same even if objections had been made when the issue just ruled upon came up again for a second, a third, and a fourth time."

*Gross,* 134 Md.App. at 623, 760 A.2d. at 775. The trial judge had just overruled counsel's objection and there is little reason to believe that the trial court would rule differently if the objection again was asserted when the issue arose with the other witnesses. There was no reasonable possibility that the result of the trial would have been different and thus, Gross suffered no prejudice under *Strickland.*

In his briefs, Gross argues that he was prejudiced because his trial counsel failed to protect the record for appeal and thus, if different appellate counsel chose to raise the issue on appeal, counsel would have been met with a "failure to preserve" argument from the State.[7] Simply failing to preserve

---

**7.** An argument could be made that the issue *was* preserved for appellate review. The Court of Special Appeals noted as much.

> "In terms of appellate prejudice, the issue was preserved for appellate review by way of the timely objection on the record to the cross-examination of the first witness. That was enough to bring this evidentiary issue to the attention of an appellate court had appellate counsel chosen to do so, and there was nothing to be gained by preserving the already preserved issue for a second, a third, and a fourth time. The issue was preserved if anyone chose to pursue it."

an issue for appellate review is not, *per se*, prejudicial or ineffective assistance of trial counsel. We need not go further in our analysis of this claim because petitioner does not argue that had this particular claim been preserved for appellate review, appellate counsel would have chosen to raise the issue, and if raised, that petitioner would have had a reasonable possibility of success.

For all of the above stated reasons, we hold that petitioner was not denied effective assistance of counsel.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.***

Chief Judge BELL concurs in the result only.

---

*Gross*, 134 Md.App. at 623, 760 A.2d at 775–76. The question of whether the issue actually was preserved has not been briefed or argued; neither, of course, has the issue of acquiescence in the ruling been addressed.