McDONALD, J.,
dissenting, in which HARRELL and RODOWSKY, JJ., join
This is a troubling case—for many reasons. A jury concluded that Petitioner James Kulbicki, a police officer, murdered, execution-style, a young woman with whom he had had an extra-marital affair and by whom he had fathered a child.[1] The evidence supporting that verdict—eyewitness, circumstantial, and forensic—was compelling[2] But that evidence was not flawless. The analysis that supported one part of the prosecution’s forensic evidence at trial was determined, many years later, not to meet the standard for the use of scientific evidence at trial.
The Majority opinion reverses Mr. Kulbicki’s conviction on the basis that his trial counsel failed to anticipate that development and thereby provided ineffective assistance of counsel in their cross-examination of the prosecution’s forensic expert on “comparative bullet lead analysis” (“CBLA”)[3]—a ground not briefed by either party in this appeal and not among the *58 questions on which we granted the writ of certiorari in this case.[4]
A criminal defendant’s right to the effective assistance of counsel is rooted in the Sixth Amendment to the federal Constitution and Article 21 of the Maryland Declaration of Rights.[5] In order to obtain relief on the ground that his right to effective assistance of counsel was violated, Mr. Kulbicki bears the burden of showing (1) that defense counsel’s performance was deficient and (2) that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Majority opinion briefly and accurately recites the principles that govern application of those two prongs. But it does not suffice to recite those criteria. A court must apply them. The Majority opinion does not. First, contrary to the principles outlined by the Supreme Court in Strickland, the Majority opinion uses information developed long after Mr. Kulbicki’s 1995 trial, and not available until years later, to find trial counsel’s performance deficient in hindsight. Second, again contrary to Strickland, the Majority opinion makes no effort to assess the alleged deficiency in light of the other evidence against Mr. Kulbicki that was unaffected by the alleged deficiency.

Whether Trial Counsel’s Performance was Deficient

To establish that his trial counsel’s performance was deficient, Mr. Kulbicki must demonstrate that it fell below an objective standard of reasonableness under prevailing profes *59 sional norms. Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Judicial review of defense counsel’s performance is to be “highly deferential” and “a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Id. at 689, 104 S.Ct. 2052; see also Evans v. State, 396 Md. 256, 274-75, 914 A.2d 25 (2006). Especially pertinent to this case, the reasonableness of counsel’s performance must be assessed “as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. 2052. In other words, this prong is satisfied only when, “given the facts known at the time, counsel’s choice was so patently unreasonable that no competent attorney would have made it.” State v. Borchardt, 396 Md. 586, 623, 914 A.2d 1126 (2007) (internal citations omitted).
The Majority opinion holds that Mr. Kulbicki’s trial counsel were ineffective because they failed to locate and make use of research concerning CBLA to discredit the forensic value of CBLA evidence generally. At the time of Mr. Kulbicki’s trial in 1995, CBLA had been used in criminal trials for nearly 30 years without serious challenge.[6] It is true that this Court ultimately determined that CBLA evidence failed to satisfy the Frye-Reed standard for the admission of scientific evidence in Maryland courts. But that decision was not issued until more than a decade after Mr. Kulbicki’s trial. Clemons v. State, 392 Md. 339, 896 A.2d 1059 (2006). Obviously, Mr. Kulbicki’s trial counsel were not deficient in failing to rely on that case. Nor, as of 1995, had any other reported case held such evidence inadmissible.[7]
*60 Nor can the Majority opinion fault Mr. Kulbicki’s trial counsel for failing to find and use the various scholarly articles and reports critical of CBLA cited and quoted at length in the Clemons decision. They did not exist in 1995. The key articles that questioned the use of CBLA evidence, including those cited in Clemons, were not published until 2002 at the earliest, seven years after Mr. Kulbicki’s second trial.[8] See Clemons, 392 Md. at 363-72, 896 A.2d 1059. Those articles spurred the FBI to commission the National Research Council (“NRC”) of the National Academy of Sciences to conduct a comprehensive review of CBLA evidence. The definitive NRC Report did not appear until 2004, nearly a decade after Mr. Kulbicki’s trial. The NRC Report found that the scientific techniques used to analyze the composition of bullets were sound, but that some inferences drawn from the composition analysis as to the source of particular bullets or fragments were unwarranted.[9] Although the NRC Report did not recom *61 mend against the use of CBLA evidence, the FBI ultimately decided to cease providing CBLA testimony in 2005. In any event, these developments occurred long after Mr. Kulbicki’s trial.
Indeed, at the time of Mr. Kulbicki’s trial, the individual widely credited with blowing the whistle on the failings of CBLA—former FBI examiner William Tobin—was still employed at the FBI, was three years away from retirement, and had yet to publish his doubts concerning that analysis. See, e.g., P. Giannelli, Comparative Bullet Analysis: A Retrospective, 47 Crim. L. Bull. Art. (Spring 2011) (“[CBLA] was not seriously challenged until a retired FBI examiner, William Tobin, began questioning the procedure in scientific and legal journals and in court testimony as well”) (footnotes omitted).[10]
The sole basis on which the Majority opinion finds trial counsel ineffective relates to a single research paper coauthored by six analysts from the FBI’s laboratories in Washington D.C. and Quantico, Virginia, including Special Agent Ernest Peele, who testified as one of the prosecution’s forensic experts at Mr. Kulbicki’s trial. See E.R. Peele, et al., Comparison of Bullets Using the Elemental Composition of the Lead Compo'nent (1991) (“FBI study” or “FBI research paper”).[11] As an initial matter, it is not entirely clear that the FBI study was readily available outside the FBI at the time of the 1995 trial, even to the most diligent researcher.[12] I have *62 caused a copy of the FBI study, which is not available online, is still not easy to obtain, and does not otherwise appear in the record of this case, to be posted with this opinion on the “highlighted cases” portion of the Court’s website, http:// mdcourts.gov/coappeals/highlightedcases/index.html#kulbicki.
Of course, assuming trial counsel could even locate the FBI research paper, what would they have done with it? The FBI study does not criticize the use of CBLA as a forensic tool. Indeed, the FBI study reports that 25 years of study of analytical data collected by the FBI has led to the conclusion that “if two bullets are produced from the same homogenous source of lead, then they will have analytically indistinguishable compositions.” FBI study at 57. The goal of the study was to “define the variability in element composition within individual bullets, among bullets within boxes of cartridges, among boxes packaged on the same date, among boxes pack *63 aged on different dates, and among boxes from different manufacturers.” Id. After summarizing the numerical results of the study, the paper concludes that CBLA provides useful forensic results. For example, it states that “when compositional overlap between boxes occurs, it is more reasonable to expect the overlap from boxes of the same types and brand of bullet, packaged near the same date.” Id. at 68. The paper ends with a hypothetical example involving the use of CBLA evidence in a criminal case—involving facts very similar to Mr. Kulbicki’s case—and concludes: “It is our opinion that these results are forensically significant in associating the victim, weapon, and suspect in this example.” Id. A defense attorney who happened to locate the FBI study might reasonably decide that using it would be counter-productive to any effort to refute the CBLA evidence in Mr. Kulbicki’s case.
The only use that the Majority opinion suggests that Mr. Kulbicki’s counsel could have made of the paper was to point out that there might be overlapping compositions of bullets packaged on different dates. Majority op. at 48-53, 99 A.3d at 739-42. In fact, the FBI study reported that, for two manufacturers—CCI and Remington—“there are no compositional group overlaps among bullets from boxes with different assembly and packaging dates.” FBI study at 61. There were overlapping compositions for bullets packaged on different dates for one manufacturer—Federal—but the FBI study concluded that this was attributable to a common lead production source and component storage before loading by that manufacturer. Id. at 61-62. A more complex compositional group distribution finding for a fourth manufacturer was attributed to the same reasons. Id. at 62. After analyzing all of the data, the study concluded that “[compositional group overlap among bullet leads are generally expected from boxes with the same assembly and packaging dates and not expected from boxes with widely different dates.” Id. at 68.
In an apparent concession that the FBI study actually supports the use of CBLA evidence, the Majority opinion criticizes the FBI study as being “at odds with the scientific method” and “inconsistent with the scientific method.” Major *64 ity op. at 50-51 & n. 11, 99 A.3d at 740 & n. 11. Although it is not entirely clear from the Majority opinion, it appears that the Majority believes that trial counsel should have located the FBI study in 1995, somehow used it to discredit CBLA evidence generally during cross-examination of Agent Peele at Mr. Kulbicki’s trial, and then simultaneously debunked the study’s methods and conclusions as “inconsistent with the scientific method.” This would have been a peculiar way to advance Mr. Kulbicki’s defense. Whether or not the Majority’s critique of the FBI study is valid, it is not the study that is under review here—it is defense counsel’s performance at the 1995 trial.
The Majority opinion downplays the extent to which defense counsel actually cross-examined Agent Peele at trial about the CBLA evidence. Mr. Kulbicki’s trial counsel cross-examined Agent Peele at some length and in detail concerning the CBLA analysis. He obtained concessions that there was no industry-wide standard for lead composition of bullets, that Agent Peele could not identify the manufacturer of any of the bullets in question, that any manufacturer would make many bullets, that bullets in one box of ammunition could have different compositions, that one of the bullets from Mr. Kulbicki’s gun was similar to but “measurably different” from the bullet fragments from the autopsy and truck and that he could not be certain they had a common source, that the other bullets from Mr. Kulbicki’s gun were so different from the bullet fragments that Agent Peele did not place them in the same “group,” and that a random bullet handed to the Agent could have a “similar” composition to the bullet fragments and bullets he tested.
Although the cross-examination was not the precise critique of CBLA that was later made in academic articles and the NRC Report, defense counsel was able to point out that the inferences drawn from composition analysis were not as rigorous as the composition analysis itself. And, in the end, Agent Peele’s testimony was not inconsistent with the results reported in the FBI study. It is not at all clear what the use of that study by defense counsel during cross-examination would have added, other than to allow the prosecution to ask Agent Peele *65 on re-direct about the conclusion of the FBI study that CBLA yielded forensically significant conclusions in murder cases.
The only post-conviction case concerning forensic evidence that the Majority cites in support of its decision actually illustrates how aberrational the Majority opinion is. See Majority op. at 47-49, 99 A.3d at 738-39, discussing Driscoll v. Delo, 71 F.3d 701 (8th Cir.1995). That case arose out of a prison riot during which two officers were stabbed, one fatally. Driscoll was charged with the stabbing that resulted in death. A key question at the murder trial concerned the absence of the murder victim’s blood type—type 0—on the defendant’s knife. A serologist testified at trial that a particular test that she had performed would not detect type 0 blood if type A blood (which happened to be the blood type of the surviving victim) was also on the knife. The Eighth Circuit held that trial counsel had provided ineffective assistance of counsel in failing to ask the serologist whether she had performed another test that would have detected type 0 blood even in the presence of type A blood. The court noted that defense counsel asked only two questions of the serologist in cross-examination and that it was evident from the lab report defense counsel received in discovery that the serologist was able to detect both blood type A and blood type 0 together on other evidence. 71 F.3d at 709. By contrast, in this case, Mr. Kulbicki’s counsel cross-examined Agent Peele extensively, asking more than 70 questions (which was considerably more questions than the prosecutor asked on direct and re-direct examination combined), making use of the Agent’s report to obtain concessions, and introducing exhibits. And there is no suggestion that Mr. Kulbicki’s counsel received anything in discovery that provided any clue to the general flaws in CBLA analysis that were unearthed many years later.
There is no question that, as developments subsequent to Mr. Kulbicki’s trial revealed, some inferences that had been drawn by FBI examiners from lead compositional analysis were seriously flawed. Whether an individual convicted at a trial at which such evidence was introduced should receive a new trial on the ground of newly-discovered evidence under *66 the standards governing a writ of actual innocence (CP § 8-301) is a serious question. But, in the context of a claim of ineffective assistance of counsel, the Majority fails to take into account the standard that we are to apply to trial counsel’s performance. Our review of counsel’s performance is to be “highly deferential” and must take account of the information available and facts known to counsel at the time of trial. Strickland, 466 U.S. at 689-90, 104 S.Ct. 2052.[13] To hold that Mr. Kulbicki’s 1995 trial counsel should have foreseen the subsequent developments with respect to CBLA analysis— most of which did not occur until the next decade—is to impose, in Judge Moylan’s pithy phrase, an “obligation to prophesy.”[14]
Boiled down to its essence, the Majority opinion holds that Mr. Kulbicki’s trial counsel should have discovered and unraveled the flaws in CBLA analysis before anyone else did by locating and using an obscure research paper—a paper that actually endorsed the use of CBLA to link a defendant to a crime involving a firearm, including murder cases in particular. That is simply not a basis on which to find that Mr. Kulbicki’s trial counsel were deficient.

Whether There was Prejudice

To establish prejudice, Mr. Kulbicki “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Den *67 isyuk v. State, 422 Md. 462, 470, 30 A.3d 914 (2011). Even if counsel’s performance is deficient, prejudice is not ordinarily presumed, except in rare cases. Redman v. State, 363 Md. 298, 310-13, 768 A.2d 656 (2001). Thus, even if he can establish that his trial counsel’s performance fell outside the “wide range of reasonable professional assistance” described in Strickland, Mr. Kulbicki must also show that there is a substantial possibility that the result of his trial would have been different. Id.
The issue of prejudice must be assessed in relation to the other evidence in the case. “In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the ... jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.... Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.” Strickland, 466 U.S. at 695-96, 104 S.Ct. 2052.
A reader of the Majority opinion might be excused for believing that the evidence against Mr. Kulbicki began and ended with CBLA testimony. The Majority opinion makes no effort to consider the testimony, exhibits, and other forensic evidence that tied Mr. Kulbicki to the crime. That evidence is largely recounted in the opinion of the Court of Special Appeals in this case,[15] and I will not repeat it here other than to summarize the main items:
• Mr. Kulbicki, a married 36-year-old police officer, had engaged in an on-again and off-again extra-marital affair with Gina Marie Neuslein, the 22-year-old victim. That relationship had occurred over the course of at least two years, had resulted in two pregnancies, and, at the time of *68 the murder, had been recently terminated by Ms. Neuslein.
• Ms. Neuslein instituted child support proceedings against Mr. Kulbicki. Although Mr. Kulbicki adamantly denied that he had had sex with her (a denial he repeated to detectives investigating the murder), a paternity test established that he was the father of her 18-month old child and a court hearing was scheduled in the child support proceeding. Ms. Neuslein was murdered the weekend before the scheduled hearing. (At his murder trial, Mr. Kulbicki conceded that he had fathered the child).
• On the day before the murder, Mr. Kulbicki picked up Ms. Neuslein in his truck while she was walking to her job at a Royal Farms Store and dropped her off at the store. According to a fellow employee, Ms. Neuslein arrived upset and appeared to have finger marks on her face. Later that evening, Mr. Kulbicki was observed sitting in his truck outside the store and later in an alley near the Neuslein residence.
• On the day of the murder, Ms. Neuslein was apparently abducted while walking to work and killed shortly thereafter by a close range gunshot to the head. Her body was found in a state park some distance from her residence and workplace.
• Based on the condition of Ms. Neuslein’s body and the location where it was found—signs that the body had been dragged and the absence of shell casings or bullets in the vicinity—homicide investigators concluded that the murder had been committed elsewhere and the body transported to the park.
• During the time frame of the murder, as estimated by the medical examiner, an eyewitness observed Mr. Kulbicki in his truck at the area of the park where Ms. Neuslein’s body was found.
• A search of Mr. Kulbicki’s home two days after the murder resulted in the seizure of Mr. Kulbicki’s denim work jacket, which had a blood stain that matched Ms. Neuslein’s DNA and blood type, but not Mr. Kulbicki’s. *69 A .38 caliber revolver was also seized from Mr. Kulbicki’s home and was determined to be operable.
• The police also seized Mr. Kulbicki’s truck two days after the murder. Although the interior of the front of the truck appeared to have been cleaned, investigators found human bone fragments (including a larger fragment identified as a skull fragment), a bullet fragment, and human blood stains.
• Expert serology and DNA analysis linked Ms. Neuslein to the bone fragments and blood stains in Mr. Kulbicki’s truck. DNA analysis of the bone fragments found in Mr. Kulbicki’s truck excluded Mr. Kulbicki but were sufficiently consistent with Ms. Neuslein’s DNA such that she could not be excluded. A number of the blood stains in the truck also bore genetic markers consistent with Ms. Neuslein’s blood, but inconsistent with Mr. Kulbicki’s.
• Expert testimony by a Smithsonian scientist established that the larger bone fragment in Mr. Kulbicki’s truck had been created by a tremendous amount of traumatic force, consistent with a contact gunshot wound, and contained lead and carbon deposits.
• Expert ballistics analysis—not CBLA analysis—of the bullet fragment from Mr. Kulbicki’s truck established that it had markings consistent with being fired from a .38 or larger caliber gun.
None of this evidence depended on the CBLA analysis. The Majority opinion makes no mention of it.
Mr. Kulbicki’s post-conviction counsel have, at various times, challenged the admissibility of other items of evidence and other aspects of his trial, but the Majority opinion does not purport to find merit in any of those challenges.

Conclusion,

If Mr. Kulbicki’s trial counsel were ineffective, it was not with respect to their challenge of the CBLA evidence. Neither prong of Strickland is satisfied here. As the Majority appears to concede, no other court that has considered a similar claim of ineffective assistance of counsel has held that *70 the failure to discover the flaws in CBLA evidence at a trial held during the 1990s amounted to ineffective assistance of counsel.[16]
To conclude that Mr. Kulbicki’s trial counsel were ineffective in not discrediting CBLA analysis before anyone else raised doubts about CBLA evidence is to distort the Strickland standards. One might chalk that up to the cliche that hard cases make bad law.[17] But while, for many reasons, this may be a hard case, the question whether trial counsel were ineffective with respect to the CBLA evidence is not.
All of this is not to say that the use of the CBLA evidence in Mr. Kulbicki’s trial is not troubling. Post-conviction counsel briefed and argued before us other grounds on which to vacate Mr. Kulbicki’s conviction based on other legal theories related to the use of the CBLA testimony at his trial. See footnote 4 above. Although my inclination would be to find that those bases are either without merit or not ripe at this time,[18] they *71 would have formed a sounder basis for the Majority’s decision without distorting the law governing ineffective assistance of counsel.
Judge HARRELL and Judge RODOWSKY have authorized me to say that they join this opinion.

. This was the second jury to reach that conclusion. Mr. Kulbicki’s initial conviction at a 1993 trial was reversed by the Court of Special Appeals on the ground that the Circuit Court should have permitted Mr. Kulbicki to present certain evidence on surrebuttal. 102 Md.App. 376, 649 A.2d 1173 (1994).

. See pp. 67-69, 99 A.3d at 750-52 below.

. Some refer to this analysis as "compositional analysis of bullet lead" and use the acronym "CABL.” See National Research Council, Forensic Analysis: Weighing Bullet Lead Analysis (2004). For the sake of consistency, I will use the acronym adopted by the parties and used by the Majority opinion to denote this type of evidence.

. Mr. Kulbicki's very competent post-conviction counsel did argue that the admission of the CBLA evidence violated due process and also suggested that developments concerning CBLA subsequent to his trial should be treated as newly discovered evidence that could be a basis for vacating his conviction under Maryland Code, Criminal Procedure Article ("CP”), § 8-301. However, the Majority opinion does not base its decision on either of those grounds.

. This Court has held that the federal and State constitutional provisions are coextensive. Lodowski v. State, 307 Md. 233, 247, 513 A.2d 299 (1986). Thus, Maryland courts apply the standards set forth in Strickland in judging claims for post-conviction relief on the ground of ineffective assistance of counsel. See, e.g., Coleman v. State, 434 Md. 320, 334, 75 A.3d 916 (2013).

. CBLA was apparently first developed as part of the investigation of the assassination of President John F. Kennedy. See P.C. Giannelli, Comparative Bullet Lead Analysis: A Retrospective, 47:2 Crim. L. Bull., Art. 6 (2011).

. The reported opinions in which CBLA evidence has been determined to be inadmissible were issued more than 10 years after Mr. Kulbicki's 1995 trial and concerned trials that occurred after the publication of reports critical of CBLA in the early 2000s. See Clemons v. State, supra (2002 trial; 2006 appellate opinion); Ragland v. Commonwealth, 191 S.W.3d 569 (Ky.2006) (2002 trial; 2006 appellate opinion). To the *60 extent that CBLA evidence was challenged prior to Mr. Kulbicki’s trial, courts had held that the evidence was admissible. See Jones v. State, 425 N.E.2d 128 (Ind.1981); State v. Krummacher, 269 Or. 125, 523 P.2d 1009 (1974). Indeed, in re-cross-examination of the prosecution’s expert in his case, Mr. Kulbicki’s counsel was able to elicit the same point emphasized by the dissent in the Jones case—that any of a large number of bullets manufactured by the same maker might be "similar" in composition. 425 N.E.2d at 135.

. See R.D. Koons, et al., Compositional Variation in Bullet Lead Manufacture, 47 J. Forensic Sci. 950 (2002); E. Randich, et al., A Metallurgical Review of the Interpretation of Bullet Lead Compositional Analysis, 127 Forensic Sci. Int'l 174 (2002); W. Tobin & W. Duerfeldt, How Probative is Comparative Bullet Lead Analysis? 17 Crim. Just. 26 (2002); E. Imwinkelried & W. Tobin, Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or Ipse Dixit?, 28 Okla. City U.L.Rev. 43 (2003); W. Tobin, Comparative Bullet Lead Analysis: A Case Study in Flawed Forensics, The Champion 12 (July 2004).

. National Research Council, Forensic Analysis: Weighing Bullet Lead Evidence (2004) ("NRC Report”). The NRC Report concluded that the analytical techniques employed by the FBI laboratory to determine the composition of bullet lead samples led to sound results. The potential problem lay in the conclusions analysts drew from those results. In the view of the NRC Report, there was some danger that expert witnesses were drawing broader conclusions from the analysis than was warrant *61 ed, such as assertions that two specimens came from the same box of ammunition. NRC Report at 91-94.

. Indeed, the critical passage from the Clemons opinion concerning three underlying premises of CBLA analysis that the Majority quotes, Majority op. at 36-37 n. 2, 99 A.3d at 732 n. 2, is a virtually verbatim quotation of a 2004 article by Mr. Tobin. See W. Tobin, Comparative Bullet Lead Analysis: A Case Study in Flawed Forensics, The Champion 12 (July 2004).

. The Majority opinion refers to this study as the "Peele Report.” In fact, Agent Peele was one of six co-authors listed on the study.

. The Majority provides a hyperlink to show that the FBI study was distributed to depository libraries sometime in 1994, although it is not *62 clear when the article would have been cataloged at any particular library. Moreover, given that depository libraries may select, with some exceptions, the government documents they choose to receive, it is not entirely clear which libraries in the Baltimore vicinity would have had a copy of the FBI study at the time of Mr. Kulbicki's second trial. See Amending Your Library’s Selection Profile, FDLP (August 19, 2014) http://www.fdlp.gov/requirements-guidance-2/guidance/10-amendingyour-library-s-selection-profile. Obviously, Mr. Kulbicki’s counsel would not have found a link to the article in the way that the Majority did. In 1995, public use of the Internet was in its infancy. Google did not yet exist. See Internet Users, Internet Live Stats (July 31, 2014), http://www.internetlivestats.eom/internet-users/#trend (less than 1% of world population had access to Internet in 1995); World Wide Web Timeline, Pew Research Internet Project (July 31, 2014), http://www. pewinternet.org/2014/03/ll/world-wide-web-timeline/ (as of 1995, 18 million Americans were online, but only 3% of that number had ever signed on to the world wide web).
In a federal district court case concerning alleged discovery violations related to CBLA evidence, it was alleged that the FBI study was not publicly available at the time of a 1999 trial—a trial that occurred four years after Mr. Kulbicki’s trial. Ultimately, the court did not resolve that question, given that a similar study had been published in 1999. See United States v. Higgs, 711 F.Supp.2d 479, 494 & n. 5 (D.Md.2010), aff'd, 663 F.3d 726, 738 (4th Cir.2011).
In any event, the Majority’s assumption that an attorney providing effective assistance of counsel in 1995 would necessarily have found this FBI research paper is highly speculative.

. “[I]t is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted). See also State v. Calhoun, 306 Md. 692, 735, 511 A.2d 461 (1986) (“There was no duty on counsel to foresee that we might hold as we held [subsequently concerning admissibility of certain evidence]”).

. State v. Gross, 134 Md.App. 528, 577, 760 A.2d 725 (2000), aff'd on other grounds, 371 Md. 334, 809 A.2d 627 (2002).

. Kulbicki v. State, 207 Md.App. 412, 418-28, 53 A.3d 361 (2012).

. See, e.g., United States v. Davis, 406 F.3d 505, 508-10 (8th Cir.2005) (not ineffective assistance of counsel at 1995 trial when research used to challenge CBLA evidence in post-conviction proceeding did not begin until three years after trial and some limitations of that evidence ultimately exposed in research were raised by defense at trial); Smith v. Department of Corrections, 572 F.3d 1327, 1350 (11th Cir.2009) (defense counsel not required to anticipate future developments concerning CBLA evidence at 1990 trial); Libby v. McDaniel, 2011 WL 1301537, at *8-9 (D.Nev.2011) (same; 1990 trial); Robertson v. State, 2009 WL 277073 (Tenn.Crim.App.2009) (same; 1998 trial); Wyatt v. State, 71 So.3d 86, 103 (Fla.2011) (defense counsel did not provide ineffective assistance of counsel with respect to CBLA evidence at 1991 trial when comprehensive research concerning flaws in CBLA evidence did not exist until well after that trial); Wyatt v. State, 78 So.3d 512, 527 (Fla.2011) (same result with respect to same defendant, but different trial); see also United States v. Higgs, 663 F.3d 726, 739 (4th Cir.2011) (defense trial counsel was not ineffective at 2000 trial in failing to ferret out internal FBI studies of CBLA that pre-dated published studies, particularly when counsel obtained important concessions on cross-examination).

. See Northern Securities Co. v. United States, 193 U.S. 197, 363, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

. Those courts that have considered due process challenges to the use of CBLA evidence have rejected that argument. See Annotation, Use *71 and Effect of Comparative Bullet Lead Analysis (CBLA) in Criminal Cases, 92 ALR 6th 549 (2014) at § 21 (collecting cases). Mr. Kulbicki has not yet followed the procedures set forth in Maryland Rule 4-332 to seek a writ of actual innocence under CP § 8-301 on the ground of newly discovered evidence.