[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11667

Non-Argument Calendar

_____

MARCIN SOSNIAK,

Petitioner-Appellant,

*versus*

MACON SP WARDEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:20-cv-00264-SCJ

_____

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Marcin Sosniak, a Georgia prisoner serving four consecutive life sentences followed by an additional one-hundred years' imprisonment, appeals the denial of his petition for a writ of habeas corpus. We affirm.

## FACTUAL BACKGROUND

Sosniak and two friends—Jason McGhee and Frank Ortegon—were drinking at Ortegon's house on the evening of March 19, 2006, when they decided to buy cocaine from a guy Ortegon knew. Sosniak was armed; two days earlier, he and McGhee bought a pistol from a local pawn shop. And Sosniak was carrying it in his backpack. After getting the cocaine, the three drove to a gas station so they could use the drugs. Then, McGhee told Sosniak and Ortegon that he "want[ed] to go out and have some fun." McGhee drove them to Chad Brown's house, where he knew they could find Chad's brother Matt. Matt and some others had stolen marijuana from Sosniak at knifepoint the previous summer. McGhee thought it was time for someone to either pay up or give the drugs back.

McGhee pulled into Chad's driveway, told the others to wait in the truck, and went inside. But Sosniak and Ortegon eventually followed McGhee in and found him arguing with Chad upstairs. Empty handed, the three left Chad to make their way back outside. Once outside Ortegon started a fight with Mark Bartlett and Billy

23-11667              Opinion of the Court              3

Osment—two boys, seventeen and fifteen, respectively—who were also at the house. McGhee pulled Ortegon away and the three left. But they'd be back.

Sosniak, McGhee, and Ortegon then went to Walmart and got some ammo for Sosniak's gun. With the ammo in hand, they made their way back to Chad's. Sosniak grabbed his gun, McGhee armed himself with a knife, and McGhee handed Ortegon a pocketknife. Then, the three went in the house. McGhee immediately started stabbing seventeen-year-old Mark Bartlett, who he ran into on the first floor. Sosniak saw Chad running out of the house, took aim, and fired. But Sosniak missed. Matt Brown then came downstairs wielding a shotgun, but it proved useless because there was no ammo in it. So Matt ran back upstairs to escape.

McGhee grabbed the gun from Sosniak and made his way upstairs, shooting anyone he saw. He first ran into seventeen-year-old Kyle Jones on the stairs and shot Jones once. In the head. Jones died shortly after. Once upstairs, McGhee shot Mark's mom Lynn Bartlett in the head. She died at the scene. McGhee continued into a room upstairs, where he found Matt, John Hatcher, Matt's girlfriend Mariel Hannah, and Osment. Matt was trying to escape out of a window, but McGhee stopped him with a shot in the leg. McGhee turned to Hatcher and shot him in the face while he was calling 911. Next, McGhee shot Hannah once in the head while she also called 911. She died of her injuries. At some point, McGhee aimed the gun at fifteen-year-old Osment and shot him twice. Once in the buttock. Once in the back of the head. He also died

of his injuries.  McGhee turned back to Matt and unloaded another ten shots from the gun.

In the end, Matt Brown, Mark Bartlett, and John Hatcher escaped with their lives.  Sosniak, McGhee, and Ortegon fled.  Ortegon went home.  Sosniak and McGhee drove to a nearby lake, where McGhee disassembled Sosniak's gun and Sosniak threw it in the lake.  After they took care of the gun, the pair drove to a gas station and ditched some of their clothes in a dumpster.  McGhee drove Sosniak home once the clothes were taken care of.

Officers came knocking on Sosniak's door the same night.  They took Sosniak down to the Criminal Investigations Division of the Sheriff's Office, where Sosniak was interviewed by Detective Thomas Moore early in the morning on March 20th.  At first, Sosniak denied everything.  He said he didn't know anything about the crimes, had no part in them, and wasn't at Chad's house that night.  But he eventually admitted to being at the house and hearing gunshots—though he maintained he wasn't involved in the attack on the house.  Sosniak was taken into custody.

After his first interview, Sosniak retained John Stokes to represent him.  Mr. Stokes was an attorney with nearly fifty years of experience who handled both criminal and civil cases.  Earlier in his career Mr. Stokes served as a state and federal prosecutor.  He was an Assistant United States Attorney from 1954 to 1961.  Later, Mr. Stokes served as an Assistant District Attorney in the Fulton County District Attorney's Office for three years.  Mr. Stokes was then the United States Attorney for the Northern District of

Georgia from 1969 to 1977.  After a few years in private practice, Mr. Stokes returned to public service as an Assistant Fulton County Solicitor General.  And he then served as the United States Marshal for the Middle District of Georgia for two or three years until starting his own private practice.

Detective Moore and Detective Josh Cox interviewed Sosniak at the CID on March 23rd with Mr. Stokes present.  At this second interview, Sosniak admitted to being with McGhee and Ortegon the night of the crimes, but he lied about several details.  For example, he claimed the trip to Walmart was so that McGhee and Ortegon could "buy a drink."  Most importantly, Sosniak still denied he was involved with the attack on Chad's house.  He said the gun was McGhee's and that Sosniak stayed in McGhee's truck while McGhee and Ortegon went into Chad's house.  And Sosniak claimed that after the murders McGhee threatened to kill him and forced him to help get rid of the gun at the lake.

Since Sosniak insisted he was innocent, Sosniak and Mr. Stokes agreed that Sosniak would go to the lake and Chad's house with the detectives after the second interview, show the detectives where they could find the gun at the lake, and then go back to the CID for another interview.  Mr. Stokes didn't think he needed go along with them or attend the later interview, so he left Sosniak with the detectives.  Sosniak agreed with that plan.  Like they discussed, Sosniak went to the lake and to Chad's house with the detectives.

The three then made their way back to the CID, and Sosniak's third interview began. At the third interview, Sosniak's story changed. Sosniak admitted that the gun was his—not McGhee's. He admitted that the trip to Walmart was for ammo—not a drink. He admitted he was in Chad's house at the time of the crimes—not in McGhee's truck. And he admitted he fired at Chad. Finally, he admitted that he went with McGhee willingly to get rid of the gun.

Following Sosniak's admissions, Detective Cox interviewed Sosniak again on March 29th. Mr. Stokes was present. Sosniak provided a more detailed version of what he said during the third interview, confirming again that the gun was his, that he fired at Chad, and that he voluntarily threw the gun in the lake.

Then Charles Haldi, a death-penalty certified lawyer who had tried five murder trials in front of juries, was appointed to take over representing Sosniak from Mr. Stokes.

## PROCEDURAL HISTORY

A grand jury indicted Sosniak on September 10, 2007, for four counts each of malice murder and felony murder, eight counts of aggravated assault, three counts of aggravated burglary, and one count of burglary. The state notified that it intended to seek the death penalty.

Mr. Haldi moved to suppress the statements Sosniak gave to the detectives on March 23rd and March 29th while in custody, arguing they should be suppressed because Mr. Stokes provided ineffective assistance of counsel to Sosniak. Mr. Haldi argued that Mr. Stokes provided ineffective assistance by (1) not familiarizing

himself with the case before advising Sosniak to cooperate, (2) advising Sosniak to cooperate at all, and (3) not going on the trip to the lake and Chad's house or attending the third interview.

The state trial court held a hearing on the motion, and Mr. Stokes testified about his decision to advise Sosniak to cooperate. Mr. Stokes explained that he always understood the state might seek the death penalty in Sosniak's case, so he thought it could "be helpful to [Sosniak] to cooperate to try" to avoid a harsher punishment, including death. Even after Sosniak admitted to being more involved in the crimes than he first let on, Mr. Stokes thought Sosniak should cooperate because "[b]ased on [Mr. Stokes's] experience in criminal prosecutions," the first defendant to cooperate "generally g[ot] better treatment and a better deal," and McGhee and Ortegon hadn't cooperated with law enforcement yet.

The state trial court denied the motion to suppress, finding that Mr. Stokes did not offer ineffective assistance of counsel because his advice to cooperate was a reasonable tactical strategy. Mr. Haldi filed an interlocutory appeal to challenge the state court's denial of the motion, and the Supreme Court of Georgia directed the parties to brief the ineffective assistance issue. But Mr. Haldi didn't. Instead, his appellate brief focused on other arguments he made to the state trial court—for example, that Sosniak's statements were involuntarily given. And at oral argument, Mr. Haldi stated he considered it "premature to address the issue of ineffective assistance of counsel" because Sosniak's case was still

ongoing, so Mr. Haldi couldn't yet demonstrate that Mr. Stokes's alleged deficiencies affected the outcome of the case. Thus, the Supreme Court of Georgia considered the issue abandoned and affirmed.

Sosniak eventually pleaded guilty to all counts other than the malice murder counts, which the state did not pursue. As part of the plea agreement, the state withdrew its intent to seek the death penalty. The trial court sentenced Sosniak to four consecutive life sentences followed by an additional one hundred years' imprisonment.

Following his sentencing, Sosniak filed an application for a writ of habeas corpus in Georgia state court. Sosniak's state habeas petition claimed that Mr. Haldi provided ineffective assistance of counsel in Sosniak's interlocutory appeal by not briefing Mr. Stokes's alleged ineffectiveness. At an evidentiary hearing on the petition, Mr. Haldi testified that he couldn't recall why he chose to abandon the issue, but he explained that he did not "know that in good faith [he] could say that [he] believed [Mr. Stokes] was ineffective" and that, as a general matter, he "rarely" pursued ineffective assistance of counsel claims. Sosniak also testified at the hearing. He maintained that he did not know the Supreme Court of Georgia directed Mr. Haldi to address Mr. Stokes's alleged ineffectiveness or that Mr. Haldi didn't brief the issue. If Sosniak knew it was an issue that could be raised or the statements were suppressed, he claimed, he wouldn't have pleaded guilty.

The state habeas court denied Sosniak's petition for two reasons. First, it found that Mr. Haldi's performance did not fall below an objective standard of reasonableness because Mr. Haldi's decision to abandon the issue of Mr. Stokes's alleged ineffectiveness was "based upon his belief that it was premature to address" it and because he "thought that the actions [Mr.] Stokes took were in" Sosniak's best interest. Second, Sosniak suffered no prejudice. While Sosniak testified that he would not have pleaded guilty had the issue been pursued, the state habeas court "d[id] not credit [Sosniak]'s testimony." The Supreme Court of Georgia denied Sosniak's application for a certificate of probable cause to appeal without providing its reasoning.

Sosniak then filed his federal petition for a writ of habeas corpus and continued to argue that Mr. Haldi provided ineffective assistance of counsel by failing to pursue Mr. Stokes's alleged ineffectiveness. The district court denied Sosniak's petition, but it relied on different reasoning than the state habeas court. It found that, even if Mr. Stokes was ineffective when advising Sosniak to cooperate, that wasn't a reason to suppress Sosniak's statements. As the district court viewed it, "absent a finding that [the] investigators were coercive," a court couldn't suppress Sosniak's statements. And if Sosniak's statements couldn't be suppressed based on the argument Mr. Haldi abandoned, Sosniak suffered no prejudice from Mr. Haldi's failure to brief it. We granted a certificate of appealability on a single issue:

Whether Sosniak's counsel for his interlocutory criminal appeal from the denial of a motion to suppress incriminating statements rendered ineffective assistance by failing to brief, after being directed to by the Supreme Court of Georgia, initial counsel's alleged ineffective assistance in allowing Sosniak to be interviewed outside his presence?

This is Sosniak's appeal.

## STANDARD OF REVIEW

We review de novo a district court's denial of a federal habeas petition. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010).

## DISCUSSION

Sosniak argues Mr. Haldi's performance fell below an objective standard of reasonableness when Mr. Haldi abandoned the issue of Mr. Stokes's ineffectiveness because he incorrectly believed raising the issue was premature in the interlocutory appeal. Sosniak was prejudiced, he argues, because Mr. Haldi's failure to get the statements suppressed led him to plead guilty. And Sosniak argues he is entitled to federal habeas relief because the state habeas court's decision rejecting those arguments was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts.

When a state court has denied a habeas petition on the merits, our review is subject to the "highly deferential standards" of the Antiterrorism and Effective Death Penalty Act. *Davis v. Ayala*, 576

U.S. 257, 269 (2015).  We can only grant relief if the state court's denial of the petition "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law"; or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d).

"To meet the 'unreasonable application' standard, 'a prisoner must show far more than that the state court's decision was merely wrong or even clear error.'"  *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quotation omitted)).  He is only entitled to relief if he can show that the state court decision denying his habeas petition was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement."  *Shinn*, 592 U.S. at 118 (quotation omitted).  When determining whether a state court's decision was unreasonable, "we are not required . . . to strictly limit our review to the particular justifications that the state court provided."  *Pye*, 50 F.4th at 1036 (emphasis omitted).  Instead, we can look to the state court's "reason[]" for denying habeas relief—like a lack of prejudice—and "consider additional rationales that support the state court's" reason.  *Id.*

As for allegedly unreasonable factual determinations, "[s]ection 2254(d)(2) works much like [section] 2254(d)(1) in that it requires us to give state courts 'substantial deference.'"  *Sears v. Warden GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).  It isn't enough that "'reasonable

minds reviewing the record might disagree' about the finding in question." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (alteration accepted) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). Rather, we "presume that the state court's factual determinations are correct, absent clear and convincing evidence to the contrary." *Sears*, 73 F.4th at 1280 (citing 28 U.S.C. § 2254(e)). "Overall," under either section 2254(d)(1) or 2254(d)(2), "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Pye*, 50 F.4th at 1034 (alteration accepted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

When, like Sosniak, a petitioner bases his petition for habeas relief on his counsel's alleged ineffectiveness, he must show both that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "As with any ineffective-assistance claim, the Supreme Court's decision in *Strickland* governs" claims that appellate counsel was ineffective. *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1366 (11th Cir. 2020). "[T]here can be no showing of . . . prejudice from an appellate attorney's failure to raise a meritless claim." *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013). In other words, there is no prejudice if "the claim would not have been successful if it were brought on appeal." *Heath v. Jones*, 941 F.2d 1126, 1136 (11th Cir. 1991). On top of succeeding on appeal, because Sosniak pleaded guilty he must show that "he would

have pleaded not guilty and insisted on going to trial" had his counsel not made any alleged error. *Hill v. Lockhart*, 474 U.S. 52, 60 (1985).

Since Sosniak's petition was denied on the merits by a state court, he is only entitled to federal habeas relief if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court of Georgia did not state its reasoning for denying Sosniak's application for a certificate of probable cause to appeal, so we must "'look through' the unexplained decision" to the state habeas court's decision and "presume that the [Supreme Court of Georgia's] unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

Sosniak hasn't shown that no "fairminded jurist[] could disagree on the correctness" of the state habeas court's determination that Sosniak wasn't prejudiced by Mr. Haldi's choice to abandon the issue relating to Mr. Stokes's ineffectiveness. *Harrington*, 562 U.S. at 101 (quotation omitted). That's because there is no "reasonable probability," *Strickland*, 466 U.S. at 694, that the claim that Mr. Stokes was ineffective "would . . . have been successful if it were brought on appeal," *Heath*, 941 F.2d at 1136; *see also Pye*, 50 F.4th at 1036 (explaining that we may consider additional rationales not relied on by the state habeas court).

In his interlocutory appeal, Sosniak would have to establish that Mr. Stokes's "representation fell below an objective standard

of reasonableness" to prevail. *Strickland*, 466 U.S. at 687–88. That claim would run right into the fact that there's "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. We've said there is a "strong reluctance to second guess strategic decisions" made by counsel, and that reluctance "is even greater where those decisions were made by experienced criminal defense counsel." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998). And when the death penalty is a possible punishment, the Supreme Court of Georgia has held that "the avoidance of a death sentence is a legitimate trial strategy." *See Chapman v. State*, 541 S.E.2d 634, 636 (Ga. 2001) ("Where, as here, the evidence of guilt in a death penalty case is overwhelming, the avoidance of a death sentence is a legitimate trial strategy.").

Simply put, Sosniak hasn't offered any indication he could have prevailed in his interlocutory appeal. Mr. Stokes, an attorney with years of experience as a both a federal and state prosecutor, advised Sosniak to cooperate with the detectives, including outside of Mr. Stokes's presence, to try to avoid a harsher sentence like the death penalty. That is exactly the kind of strategic decision courts are "reluctan[t] to second guess," *see Provenzano*, 148 F.3d at 1332, and that the Supreme Court of Georgia has described as "a legitimate . . . strategy," *cf. Chapman*, 541 S.E.2d at 636. And Sosniak offers nothing to show there is a reasonable probability he would have rebutted the "strong presumption" that Mr. Stokes's advice was a reasonable strategic choice. *See Strickland*, 466 U.S. at 689. If his appeal wouldn't have succeeded, the failure to pursue it didn't

23-11667                Opinion of the Court                15

prejudice him.  *Brown*, 720 F.3d at 1335; *Heath*, 941 F.2d at 1136. Thus, the state court's decision that Sosniak was not prejudiced was not unreasonable.

There's a second rationale supporting the state court's prejudice determination:  its reasonable factual determination that Sosniak would have pleaded guilty anyway.  Sosniak testified that he would not have pleaded guilty in the absence of any error, but the state habeas court "d[id] not credit" that testimony.  That factual determination is entitled to substantial deference and "presumed correct" unless Sosniak can rebut it with "clear and convincing evidence."  28 U.S.C. § 2254(e).  Instead, he hasn't offered anything to rebut it.  He therefore hasn't shown that the state court's decision was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d), and if Sosniak would have pleaded guilty anyway, the state habeas court reasonably found that he was not prejudiced, *see Hill*, 474 U.S. at 60.

## CONCLUSION

Sosniak has not established that the state court's decision that he was not prejudiced was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.  Thus, we don't need to reach the state habeas court's determination that Mr. Haldi's actions did not fall below an objective standard of reasonableness.  *See Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 795 (11th Cir. 2020) ("Failure to establish either [*Strickland*] prong is fatal and makes it unnecessary to consider the other.").

16                    Opinion of the Court                    23-11667

**AFFIRMED**.